PRESENT: All the Justices

PATRICIA ANN GERALD

v.  Record No. 161844

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE ELIZABETH A. McCLANAHAN
May 31, 2018

TARSHA MARIE GERALD

v.  Record No. 170356

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Patricia Gerald ("Patricia") and her daughter, Tarsha Gerald ("Tarsha") (collectively "the

Geralds"), were tried together and convicted in a bench trial in the Albemarle County Circuit

Court upon warrants charging each of them with driving while on a suspended license, third or

subsequent offense, and upon indictments charging each of them with perjury arising from

testimony they gave in the Albemarle County General District Court.

The Geralds challenge the sufficiency of the evidence to support their perjury convictions

and the territorial jurisdiction of the Albemarle County Circuit Court over perjury committed in

the Albemarle County General District Court, which is located in the City of Charlottesville.

Additionally, Tarsha challenges the sufficiency of the evidence to support her conviction for

driving while on a suspended license.  We affirm the Geralds' convictions.

I.   BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Scott v.*

*Commonwealth*, 292 Va. 380, 381, 789 S.E.2d 608, 608 (2016) (citing *Baldwin v.*

*Commonwealth*, 274 Va. 276, 278, 645 S.E.2d 433, 433 (2007)). Therefore, we will "discard the evidence of the [Geralds] in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Kelley v. Commonwealth*, 289 Va. 463, 467-68, 771 S.E.2d 672, 674 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980)).

A. May 26, 2013 Accident and Investigation

On May 26, 2013, Patricia was operating a vehicle, in which Tarsha was riding as a passenger, when she rear-ended a vehicle operated by Paul Welch ("Welch") while he was stopped at a traffic light on Ivy Road in Albemarle County. Welch exited his vehicle and saw Patricia exit from the driver's side of the Gerald vehicle. Upon approaching Welch, Patricia told him that she was sorry. Tarsha, who had been in the passenger seat of the vehicle, also exited the vehicle. She told Welch that she was the owner of the vehicle and gave Welch a state-issued identification card and her insurance information. The only other individual Welch observed in the vehicle was a woman, who was seated in the backseat, and did not exit the vehicle. Welch noticed "groceries all over the backseat also." After Welch asked for Patricia's driver's license, Tarsha "ran around to the driver's side, hopped in the car," and Patricia "got in the passenger seat, and they sped off." Welch "got in [his] car and followed them until [he] could verify that [he] had the correct license plates."

Officer Ralph Scopelliti ("Scopelliti") responded to the scene of the accident and spoke to Welch. Scopelliti relayed the information given to him by Welch to the dispatcher. Officer Carl Scott Miller ("Miller") heard the dispatch and located the Geralds' vehicle in a parking lot at Treesdale Apartments, which was the address associated with the vehicle. He observed several people around the vehicle unloading groceries, including Patricia and Tarsha. When he

2

"asked whose vehicle it was" and "who was driving the car," Patricia identified herself and asked Miller "if this was about the crash," to which Miller replied "that it was about the crash." Patricia stated that "it was her vehicle" and "that she had been driving." After Miller asked Patricia for her driver's license, Patricia retrieved a state-issued identification card from a nearby vehicle and told Miller her license was suspended for failure to pay reinstatement fees. Tarsha told Miller "she was not driving the vehicle when the crash occurred, but her mother was very upset after the crash and so she drove the vehicle home." Tarsha acknowledged her license was also suspended. Miller relayed this information to Scopelliti and "confirmed that [Patricia's and Tarsha's driver's licenses] were both suspended."

After Scopelliti received the information gathered by Miller, Scopelliti contacted Patricia and Tarsha by telephone. First, he spoke to Tarsha who admitted that she was involved in an accident and that "she drove off after the accident." She also claimed "she had a valid driver's license." Scopelliti then spoke to Patricia, who also admitted that she was involved in an accident, though she claimed "she drove before and after the accident" and that she had a valid driver's license.

Based on the results of his investigation, Scopelliti obtained warrants of arrest against Patricia and Tarsha charging both of them with operating a motor vehicle while on a suspended license in violation of Code § 46.2-301, third or subsequent offense. Each warrant specified that the offense was committed on or about May 26, 2013, the date of the accident with Welch.

B. Driving While Suspended Trial in General District Court

On October 8, 2013, Patricia and Tarsha were tried together on the charges of driving while their licenses were suspended, third or subsequent offense, by the Albemarle County General District Court. Present at trial were Scopelliti, Patricia, Tarsha, and Welch, in addition

3

to the Commonwealth's Attorney and the Geralds' attorneys.[1]  The presiding judge administered oaths to the witnesses, all of whom raised their right hands and swore that the testimony they were going to provide was the truth.  According to Welch, he gave the same testimony in the general district court that he did in the circuit court.

In defense of the charges of driving while their licenses were suspended on or about May 26, 2013, Patricia and Tarsha both denied driving when they testified on direct-examination. Because there was no court reporter in the general district court, the specific answers given by Patricia and Tarsha during their cross-examinations were introduced at the later circuit court proceedings through Scopelliti, who was present when Patricia and Tarsha testified.  According to Scopelliti, the Commonwealth had a copy of Miller's investigative notes and "[would] read a sentence from Officer Miller's notes and ask [each] defendant to acknowledge or deny the sentence."  Scopelliti also had a copy of Miller's notes, and at the request of the Commonwealth's Attorney, took "very specific notes" of the "very specific questions" asked by the Commonwealth.

When the Commonwealth asked Patricia if she spoke to Miller specifically regarding the accident, "[her] answer was no."  When the Commonwealth asked Patricia if "Officer Miller asked her about her driver's license and if she had told him that she did not have one because she had to pay reinstatement fees," her "answer was no, she didn't make any of those statements." When the Commonwealth asked Patricia "if the officer asked if her name was Patricia Gerald and that she had been driving the car that day," her "answer was no."  In other words, "each question was asked by reading Officer Miller's notes, and then [Patricia] answered no."

Likewise, Scopelliti "read along with the prosecutor from Officer Miller's notes" and

---

[1] Miller was not able to be present for the trial in general district court.

"ke[pt] track of what the prosecutor asked and what Ms. Tarsha Gerald answered." The Commonwealth "asked Tarsha Gerald if she told Officer Miller that she drove the car home because her mother was too upset and could not drive, and she said no." The Commonwealth asked Tarsha if she said "anything" to Miller "about that she was suspended, and she said no." The Commonwealth asked both appellants if "they understood they were under oath" and both "said they understood, and that, yes, they knew they were under oath." Each appellant was asked if her testimony was "truthful" and each appellant "answered yes, it was truthful."

The general district court found both Patricia and Tarsha guilty of the charges of driving while on a suspended license, third or subsequent offense, and both appealed their convictions to the circuit court. Patricia and Tarsha were indicted for perjury arising from their testimony at the trial in the general district court.[2]

C. Circuit Court Proceedings

Patricia and Tarsha were tried together in the circuit court on the perjury and driving while on a suspended license charges. The Commonwealth presented testimony from Welch, Miller, and Scopelliti. Tarsha testified in her own defense and presented testimony from Bianca Horne ("Horne")[3] and Aaron Alexander ("Alexander"). Although Tarsha called Patricia as a witness, Patricia invoked her Fifth Amendment privilege against self-incrimination and refused to testify. Patricia did not testify in her own defense.

Tarsha claimed that Horne was driving Tarsha's vehicle at the time of the accident. According to Tarsha, she was sitting in the front passenger seat and Patricia was sitting in the

---

[2] The indictments originally alleged an offense date of September 24, 2013. On motion granted by the circuit court, the Commonwealth amended the date of the offenses to October 8, 2013.

[3] Bianca Horne was also referred to as "Tiffany."

back seat with Patricia's boyfriend, Alexander, and Tarsha's two children. At the time of the accident, they were returning from Waynesboro where they had been shopping. Tarsha testified that Welch "had hit another car, and when Bianca tried to stop the car, it laid into . . . the passenger side on his car." Tarsha stated that after the accident, she exited the vehicle with Horne, Patricia, and Alexander and gave Welch her "information," after which Welch told them they could leave. Tarsha claimed that Horne drove Tarsha's vehicle to Treesdale Apartments and that, shortly thereafter, Miller arrived and spoke with Tarsha and Patricia. Tarsha denied speaking to Scopelliti on the telephone.

Tarsha denied testifying falsely in general district court. According to Tarsha, she was asked in general district court whether she talked with Scopelliti, not whether she talked with Miller. Tarsha claimed that she testified in general district court that she did speak with Miller and told him she did not have a license, but that she did not tell him she drove her vehicle from the accident scene to Treesdale Apartments.

Alexander also claimed that Horne was driving Tarsha's vehicle at the time of the accident.[4] He stated that Patricia, Tarsha, and Tarsha's children were in the vehicle and they went grocery shopping in Waynesboro. Alexander testified that when the accident happened, they were "at the light" and two cars in front of them "had already crashed." According to Alexander, Welch came to their vehicle to exchange information with Horne and none of them got out of the vehicle.

---

[4] Initially, Alexander testified that he "didn't know what was going on" because he was "sitting in the back" of Tarsha's vehicle and "was asleep." Although Alexander testified he first got into the vehicle at Treesdale Apartments, in response to counsel's question regarding what time he got into the vehicle, he stated he would "have to take the [F]ifth on this, because I'm hurting" from back pain. When asked again by the circuit court, Alexander stated he didn't know what time it was, "but I can tell you that Tiffany was driving, and that's all."

When Horne testified and was asked by Tarsha's counsel if she was present at an accident on May 26, 2013, she answered: "I was a licensed driver coming back from Waynesboro back to Charlottesville, and I plead the Fifth." Horne later stated: "Coming from Waynesboro, was in, on the left-hand side, car stopped, asked for my license and registration. Then I went back home to Tarsha's, and that was it." Horne claimed she had known Tarsha "five months" or "a year" through Tarsha's cousin, whose name she did not know. When counsel noted that the accident occurred "about a year and a half ago," Horne stated that she did not know Tarsha at that time but "met her in Waynesboro." Horne claimed that she and Tarsha went grocery shopping and that no one else was with them in Waynesboro or in the vehicle on the way to Charlottesville.

During trial, Patricia and Tarsha objected to the venue for prosecution of the perjury charges against them. They argued that the Albemarle County General District Court, where the perjury was allegedly committed, is housed in the Albemarle County Courthouse, which is located in the City of Charlottesville, not Albemarle County. Patricia and Tarsha also moved to strike the evidence against them at the close of the Commonwealth's evidence and renewed their motions at the conclusion of all evidence. The circuit court denied the motions to strike, granted the parties leave to submit briefs on the issue of venue, and continued the case for closing arguments following submission of the briefs on venue.[5]

After consideration of the briefs and argument, the circuit court ruled that venue for perjury committed in the Albemarle General District Court was proper in the Albemarle County

---

[5] Although the transcript of the proceedings does not reflect that Tarsha's motions to strike specifically included the driving while on a suspended license charge, the circuit court's order denying her motion for reconsideration states that the court "denies the motion to reconsider denial of motion to strike the evidence on the perjury and driv[ing while] on [a] suspended [license] charges."

Circuit Court. The circuit court found that while the Albemarle County Courthouse is located within the City of Charlottesville, the jurisdiction of the City of Charlottesville and Albemarle County in judicial proceedings over property owned by the county within city limits is "joint," i.e., "shared," under the City of Charlottesville's charter.

The circuit court found Patricia and Tarsha guilty on the charges of perjury and driving while on a suspended license, third or subsequent offense. The circuit court explained it "was impressed" with "Welch's statement about what occurred" and gave "great weight" to his testimony. The circuit court noted the "great deal of detail in [Welch's] recollection" of the events of the accident, including his identification of Patricia as the driver and Tarsha as the passenger when the accident occurred, his conversations with the Geralds at the scene, and his observation that Tarsha drove her vehicle from the scene after Welch asked for Patricia's driver's license. The circuit court found that Welch was not "in shock" after the accident, that he did not have "some hidden motive," and that this was not "all about collecting insurance" for him. The circuit court stated that there was nothing in his cross-examination that "attacked" or "took away from Mr. Welch's credibility."

The circuit court credited the testimony of Miller, noting that the statements Patricia and Tarsha gave Miller at the Treesdale Apartments were consistent with the testimony of Welch. The circuit court also credited the testimony of Scopelliti, finding that "both Patricia Gerald and Tarsha Gerald denied in court that they were driving." The circuit court stated that "whether or not one is driving at the time of an accident seems to be a singular significant event" that is "a material fact in a driving [on a] suspended [license] charge" and is "significantly different than remembering what date something occurred."

8

In contrast to the testimony by the Commonwealth's witnesses, the circuit court found the testimony of Tarsha, Horne, and Alexander inconsistent and not credible. The circuit court specifically noted that "Bianca was very uncomfortable testifying" and "there are too many discrepancies in the testimony between the defendant and the other witnesses."

A panel of the Court of Appeals affirmed the Geralds' convictions in separate unpublished opinions. *Gerald v. Commonwealth*, Record No. 1931-15-2, 2016 Va. App. LEXIS 367 (Dec. 27, 2016); *Gerald v. Commonwealth*, Record No. 1967-15-2, 2016 Va. App. LEXIS 370 (Dec. 27, 2016). After the Court of Appeals denied the Geralds' petitions for rehearing en banc, we awarded appeals to the Geralds and consolidated their cases for decision.

## II. ANALYSIS

### A. Sufficiency of Evidence to Support Appellants' Perjury Convictions

Both appellants challenge the sufficiency of the evidence to support their perjury convictions. When reviewing the sufficiency of the evidence, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512, 808 S.E.2d 408, 413 (2017) (quoting Code § 8.01-680). In such cases, the Court does not ask *itself* whether *it* believes the evidence establishes the essential elements of the crime beyond a reasonable doubt, but whether *any rational trier of fact* could have so found. *Id.* "These principles apply with equal force to bench trials no differently than to jury trials." *Commonwealth v. Moseley*, 293 Va. 455, 463, 799 S.E.2d 683, 687 (2017) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 249, 781 S.E.2d 920, 930 (2016)).

Code § 18.2-434 provides, in pertinent part: "If any person to whom an oath is lawfully administered on any occasion willfully swears falsely on such occasion touching any material

9

matter or thing . . . he is guilty of perjury." Therefore, in order to sustain a perjury conviction, the Commonwealth has the burden of proving: (1) that an oath was lawfully administered; (2) that the defendant willfully swore falsely; and (3) that the facts to which the defendant swore falsely were material to a proper matter of inquiry. *Pijor*, 294 Va. at 513, 808 S.E.2d at 414; *Mendez v. Commonwealth*, 220 Va. 97, 102, 255 S.E.2d 533, 535 (1979). To be material, "[t]he testimony must have been relevant in the trial of the case, either to the main issue or some collateral issue." *Holz v. Commonwealth*, 220 Va. 876, 881, 263 S.E.2d 426, 429 (1980).

The perjury indictments arose from the testimony the Geralds gave at their trial in general district court on charges of driving while on a suspended license. The warrants specifically alleged that each of them drove while on a suspended license on or about May 26, 2013 – the date of the accident with Welch. The Commonwealth proved, and the Geralds do not contest, that an oath was lawfully administered to them at the general district court trial. The Commonwealth proved, through the testimony of Welch, that Patricia was driving the Gerald vehicle on May 26, 2013, when the accident with Welch's vehicle occurred and that, after the accident, Tarsha switched places with Patricia and drove the vehicle from the accident scene.

The Commonwealth also proved, through the testimony of Miller, that shortly after the accident, Patricia told Miller she was driving when the accident occurred and that her license was suspended. Likewise, the Commonwealth proved that Tarsha told Miller that Patricia was driving when the accident occurred, but that Tarsha drove the vehicle home after the accident and that her license was suspended.

Yet, in defense of the charges that they were driving while their licenses were suspended on the date of the accident, Patricia and Tarsha both testified under oath in the general district court that they were not in fact driving, that they did not tell Miller that they were driving, and

10

that they did not tell Miller that their licenses were suspended – facts that the circuit court found were false and material to the proper matter of inquiry into whether, as charged in the warrants, they were driving while on suspended licenses on or about May 26, 2013.

Nevertheless, the Geralds argue that because the Commonwealth failed to prove the precise questions to which they answered by denying that they had been driving, the evidence was insufficient to prove that their answers were false. Patricia posits, for example, that if she was asked whether she drove away from the accident scene, her denial of driving would have been truthful. Tarsha theorizes that if her denial of driving was to the question of whether she drove from Charlottesville to Waynesboro, her answer would not have been proven false.[6] Tarsha further suggests she may have "simply blurted [her denial] out" or given her answer "in response to a question that [was] ambiguous." In short, Tarsha contends that her denial of driving cannot, as a matter of law, be false, because "this Court must guess at what the question was to which Tarsha's denial of driving was an answer, or even guess whether she made such statement in response to any question."

We disagree that the circuit court was left to speculate on the questions that elicited the Geralds' denials of driving in general district court. They were charged with driving while their licenses were suspended on or about May 26, 2013, and both pled not guilty to the charges. Welch confirmed that he gave the same testimony in the general district court that he did in the circuit court, and therefore, testified that Patricia was driving the vehicle when the accident on

---

[6] Tarsha assumes, for purposes of her challenge to the sufficiency of the evidence supporting her perjury conviction, that the circuit court could have found beyond a reasonable doubt that she was driving on May 26, 2013, and admitted that she was driving to Officers Miller and Scopelliti. She further assumes, for purposes of this issue, that the trial court could have found beyond a reasonable doubt that she denied driving in general district court as testified to by Scopelliti.

11

May 26 occurred and that Tarsha was driving the vehicle when they left the accident scene. Scopelliti recorded the specific questions asked by the Commonwealth's Attorney and the responses given by the Geralds based on Miller's investigatory notes. When testifying in general district court, Patricia specifically denied speaking with Miller and telling him "that she had been driving the car that day." When Tarsha testified in general district court, she specifically denied telling Miller "she drove the car home because her mother was too upset." [7]

The circuit court found that "both Patricia Gerald and Tarsha Gerald denied in court that they were driving," stating that "whether or not one is driving at the time of an accident seems to be a singular significant event" that is "different than remembering what date something occurred." In light of the detailed nature of the evidence of Patricia's and Tarsha's driving with reference to the accident, it would be unreasonable to conclude that the Geralds' denials of driving were in response to ambiguous questioning or an inquiry into their driving at a time or place other than what the Commonwealth actually sought to prove.

Accordingly, the circuit court's judgment finding Patricia and Tarsha guilty of perjury was not "plainly wrong or without evidence to support it." *Pijor*, 294 Va. at 512, 808 S.E.2d at 413 (quoting and applying Code § 8.01-680).[8]

---

[7] Tarsha denied testifying in general district court that she did not tell Miller she drove the vehicle home from the accident scene. Thus, her own testimony confirms that the driving in question was whether she drove home from the accident scene on May 26, 2013, as the Commonwealth contended.

[8] We find no merit in Patricia's argument that there is a reasonable hypothesis of innocence that she told the truth in general district court under oath because she may have "switched seats with the actual driver" before Welch observed her exiting from the driver's seat and then lied to others outside of court "to cover for the actual driver who may have had a worse driver's status." Hypotheses of innocence that must be excluded "are those which flow from the evidence itself, and not from the imaginations of defense counsel." *Cook v. Commonwealth*, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983). "[T]he factfinder determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the

B. Venue for Perjury Committed in the General District Court of Albemarle County

The Geralds contend that venue for prosecution of the perjury charges against them was not proper in Albemarle County because the perjury was committed in the Albemarle County Courthouse, which is located in the City of Charlottesville.[9]

"Except as otherwise provided by law, the prosecution of a criminal case shall be had in the county or city in which the offense was committed." Code § 19.2-244. "The import of the foregoing language is clear: A crime must generally be tried where it occurred." *Garza v. Commonwealth*, 228 Va. 559, 566, 323 S.E.2d 127, 131 (1984). The place or "venue" for trial touches upon the court's "territorial jurisdiction." *Porter v. Commonwealth*, 276 Va. 203, 230, 661 S.E.2d 415, 427-28 (2008) (distinguishing a court's subject matter jurisdiction from the court's territorial jurisdiction, which is the authority to adjudicate "at a particular place" or "venue"); *see also In re Vauter*, 292 Va. 761, 769, 793 S.E.2d 793, 797 (2016) (stating in the context of habeas corpus proceedings that "the concept of 'territorial jurisdiction . . . means venue'") (quoting *Tazewell Cnty. Sch. Bd. v. Snead*, 198 Va. 100, 106-07, 92 S.E.2d 497, 502-03 (1956)); *Kelso v. Commonwealth*, 282 Va. 134, 139, 710 S.E.2d 470, 473 (2011) (noting that the terms "territorial jurisdiction" and "venue" are synonymous and have been used interchangeably); *Board of Supervisors v. Board of Zoning Appeals*, 271 Va. 336, 344, 626

---

hypotheses of innocence advanced by a defendant." *Moseley*, 293 Va. at 464, 799 S.E.2d at 687. Patricia's hypothesis has no foundation in the evidence and the circuit court rejected it as unreasonable. In any event, the circuit court found that Patricia was in fact driving when it convicted her of driving while on a suspended license and Patricia has not challenged this conviction.

[9] The circuit court found that the Albemarle County Courthouse was located in the City of Charlottesville, based upon the evidence presented by the Geralds and the Commonwealth. The Commonwealth does not dispute this finding of fact.

13

S.E.2d 374, 379 (2006) (defining "territorial jurisdiction" as "authority over persons, things, or occurrences located in a defined geographic area") (internal quotation marks and citations omitted).

By including the language "[e]xcept as otherwise provided by law," Code § 19.2-244 expressly recognizes that there are exceptions to the general rule that criminal charges be prosecuted where they are committed.[10] The General Assembly created such an exception by granting "joint jurisdiction" to the City of Charlottesville and Albemarle County over county property located within the City of Charlottesville. When the town of Charlottesville was

---

[10] *See, e.g.,* Code § 17.1-515.2 (providing for concurrent jurisdiction of courts of specified counties and cities with respect to crimes committed on property owned or occupied by the county and located in the city); Code § 17.1-515.1 (extending territorial jurisdiction of Lynchburg Circuit Court as specified); Code § 19.2-250(A) (providing, with some exceptions, for "jurisdiction of the corporate authorities" of towns or cities extending one mile beyond corporate limits); Code § 19.2-250(B) (providing for "jurisdiction of authorities" of Chesterfield County and Henrico County extending one mile beyond corporate limits into City of Richmond); *see also* Code § 19.2-245 (providing for venue where the offender is found or where stolen property has been taken in prosecution of offenses committed outside of and punishable in the Commonwealth); Code § 19.2-245.01 (providing for venue in the City of Richmond for prosecution of offenses involving reports or statements concerning cigarette sales or stamping); Code § 19.2-245.1 (providing for venue where a writing was forged, used, or passed, or attempted to be used or passed, or where writing is found in possession of defendant in prosecution of forgery); Code § 19.2-245.2 (providing for venue where false or fraudulent tax return or document was filed or where offender resides for prosecution of offenses involving tax); Code § 19.2-246 (providing for venue where offender was at time when inflicting mortal wound or other injury upon a person outside of the Commonwealth); Code § 19.2-247 (providing for venue where body found or from where victim removed from Commonwealth in certain homicide cases in which circumstances make it unknown where crime occurred); Code § 19.2-248 (providing that where mortal wound or other injury is inflicted in one county or city and death ensues in another venue lies in either place); Code § 19.2-249 (providing that in cases where an offense is committed on the boundary of two counties, two cities, or the boundary of a county and city, or within 300 yards thereof, venue lies in either county, either city, or either the county or the city); Code § 19.2-249.1 (providing that an offense committed within a town situated in two or more counties may be prosecuted in any of such counties); Code § 19.2-249.2 (providing various places in which certain computer and videographic crimes may be prosecuted).

incorporated as a city in 1888, the boundaries of the city encompassed the property on which the Albemarle County Courthouse and county jail were located.  *See* 1888 Va. Acts ch. 343, at 411-12, 415-16.  In recognition of this fact, the General Assembly provided in the charter:  "The property now belonging to the county of Albemarle within the limits of the city of Charlottesville, *shall be subject to the joint jurisdiction of the county and city authorities*, and shall not be subject to taxation by the authorities of either county or city."  1888 Va. Acts ch. 343, at 415 (emphasis added).[11]

The provision for "joint jurisdiction" over county property located in the City of Charlottesville has remained, in similar form, in the subsequent versions of Charlottesville's charter.  *See* 1900 Va. Acts ch. 1012, at 1142; 1908 Va. Acts ch. 285, at 455.  The current charter states that "[t]he property now belonging to the county of Albemarle within the limits of the City of Charlottesville *shall be within and subject to the joint jurisdiction of the county and city authorities and officers*, and shall not be subject to taxation by the authorities of either county or city."  1946 Va. Acts ch. 384, at 746 (emphasis added); Charlottesville, Va. Code of Ordinances § 48 (emphasis added).

Since the Albemarle County Courthouse is located within the city limits of Charlottesville, it is "*within and subject to* the joint jurisdiction of the county and city authorities and officers." *Id.* (emphasis added).  The term "jurisdiction" as used in the charter establishes the territorial jurisdiction of the courts.  *See, e.g., Smolka v. Second Dist. Committee of Virginia State Bar*, 224 Va. 161, 165, 295 S.E.2d 267, 269 (1982) (noting that "[a] provision may use the word 'jurisdiction' in the sense that the court has territorial jurisdiction over the subject matter,

---

[11] The General Assembly also provided for the "right of said city" to "joint occupancy and use" of "the courthouse and jail and their respective lots and other buildings thereon."  1888 Va. Acts ch. 343, at 416.

15

meaning that the court is the proper venue"); *Southern Sand & Gravel Co. v. Massaponax Sand & Gravel Corp.*, 145 Va. 317, 326, 133 S.E. 812, 814 (1926) (holding that statutory sections using the word "jurisdiction" fix the venue); *Moore v. Norfolk & Western Ry. Co.*, 124 Va. 628, 635, 98 S.E. 635, 637 (1919) (noting that "jurisdiction" used in the statutory provision at issue "involves the venue").

It follows from the charter's grant of territorial jurisdiction to the county and city courts that crimes committed in the Albemarle County Courthouse are treated as having been committed "within" either the jurisdiction of the county or the city and, therefore, are subject to the "joint jurisdiction" of the county and city courts. 1946 Va. Acts ch. 384, at 746; Charlottesville, Va. Code of Ordinances § 48.[12] *See Garza*, 228 Va. at 566, 323 S.E.2d at 130 (statute providing for concurrent jurisdiction of Roanoke County courts and City of Salem courts over criminal offenses committed upon property located in the City of Salem and owned or occupied by Roanoke County "operates to treat a crime which occurs on jail property as if that crime occurred either in the county or the city"). Therefore, venue for prosecution of crimes committed in the Albemarle County Courthouse is proper in either Albemarle County or the City of Charlottesville.

We reject the Geralds' assertion that the provision for "joint jurisdiction" in the charter necessarily refers to "legislative" jurisdiction. The charter applies broadly to "authorities" and

---

[12] Our holding in *Fitch v. Commonwealth*, 92 Va. 824, 828, 14 S.E. 272, 273 (1896) does not compel a different conclusion. In *Fitch*, we held that perjury committed in the County Court of Augusta County properly fell within the territorial jurisdiction of the Hustings Court of the City of Staunton because the county courthouse was located in the city. In contrast to the broad grant of "joint jurisdiction" to the City of Charlottesville and Albemarle County over county property located in the city, there was no such grant of power to Augusta County. Under Code § 17.1-515.2, the circuit and district courts of Augusta County now have concurrent jurisdiction with the courts of the City of Staunton over criminal offenses committed upon property located in the City of Staunton that is owned or occupied by Augusta County.

16

"officers," terms that include courts and officers of the court, such as judges, magistrates, and justices. *See Murray v. City of Roanoke*, 192 Va. 321, 324, 327, 64 S.E.2d 804, 806, 808 (1951) (holding that power granted to "corporate *authorities*" in statutory provision was granted to "the corporation *courts* of the cities" and stating that "jurisdiction" is "the authority by which judicial *officers* take cognizance of, and apply and enforce the law") (emphases added); *see also* Code § 19.2-119 (defining "[j]udicial officer" as used in that chapter to mean "any magistrate serving the jurisdiction, any judge of a district court and the clerk or deputy clerk of any district court or circuit court within their respective cities and counties, any judge of a circuit court, any judge of the Court of Appeals and any justice of the Supreme Court of Virginia"); Code § 19.2-56.2 (defining "[j]udicial officer" as used in that section to mean "judge, magistrate, or other person authorized to issue criminal warrants"); *Bellamy v. Gates*, 214 Va. 314, 316, 200 S.E.2d 533, 535 (1973) (noting that "judicial officers, acting within their jurisdiction, are exempt from liability in civil actions for their official acts"); *McHone v. Commonwealth*, 190 Va. 435, 441-43, 57 S.E.2d 109, 112-13 (1950) (discussing duty of arresting officer to bring defendant before "judicial officer" within reasonable time after arrest); *Baylor v. Commonwealth*, 190 Va. 116, 121, 56 S.E.2d 77, 79 (1949) (referring to "justice of the peace, police justice, civil and police justice, juvenile and domestic relations court judge or other trial justice" as "judicial officers").[13]

---

[13] We are also unpersuaded by Tarsha's contention that the General Assembly's use of the word "joint" rather than "concurrent" lends support to her assertion that the charter's grant of "joint jurisdiction" is limited to legislative jurisdiction. The terms "joint" and "joint jurisdiction" are synonymous with and used interchangeably with the terms "concurrent" and "concurrent jurisdiction" in this and similar contexts. *See e.g., In re Estate of Cassidy*, 313 A.2d 435, 438 (Me. 1973) (holding that "[c]oncurrent jurisdiction means joint and equal jurisdiction"); *Shinn v. Shinn*, 29 N.W.2d 629, 633 (Neb. 1947) (stating in context of discussion of jurisdiction that "[t]he word concurrent means joint and equal in authority"); *State v. King*, 142 N.E.2d 222, 225 (Ohio 1957) (stating in context of discussion of jurisdiction that "[c]oncurrent, as here used, means that which is joint and equal in authority"); *Menapace v. State*, 768 P.2d 8, 11 (Wyo.

In sum, venue for prosecution of perjury committed by the Geralds in the General District Court of Albemarle County was proper in the Circuit Court of Albemarle County.

C. Sufficiency of Evidence Supporting Tarsha's Driving While Suspended Conviction

Tarsha argues that the evidence supporting her conviction for driving while on a suspended license was insufficient because Welch's testimony that she was driving was "inherently incredible." Tarsha "insists that she was not driving, that Mr. Welch was lying, that Officer Miller was lying and that Officer Scopelliti was lying."

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Elliott v. Commonwealth*, 277 Va. 457, 462, 675 S.E.2d 178, 181 (2009) (collecting cases). "[T]his [C]ourt will not seek to pass upon the credibility of the witnesses where their evidence is not inherently incredible." *Rogers v. Commonwealth*, 183 Va. 190, 201-02, 31 S.E.2d 576, 580 (1944). Evidence is not "incredible" unless it is "so manifestly false that reasonable men ought not to believe it" or "shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ." *Juniper v. Commonwealth*, 271 Va. 362, 415, 626 S.E.2d 383, 417 (2006).

---

1989) (referring to concurrent jurisdiction of juvenile court and district court over offenses committed by minor age 17 or older, at initial discretion of prosecutor, as "joint jurisdiction"); *State v. Williams*, 347 A.2d 33, 36 (N.J. Super. 1975) (referring to the reciprocal jurisdiction of two counties over a highway divided by the counties as "joint jurisdiction"); *Commonwealth v. Fels*, 428 A.2d 657, 659 (Pa. Super. 1981) (referring to concurrent jurisdiction of Pennsylvania and United States over defendant's criminal offense as "joint jurisdiction").

There is no basis in the record to support Tarsha's contention that the testimony of Welch was inherently incredible.[14] To the contrary, the circuit court "was impressed" with "Welch's statement about what occurred" and gave "great weight" to his account of the accident, specifically including his observation that Tarsha "ran around to the driver's side, hopped in the car," and drove the vehicle from the scene after Welch asked for Patricia's driver's license. The circuit court found that Welch was not "in shock" after the accident, that he did not have "some hidden motive," that this was not "all about collecting insurance" for him, and that there was nothing in his cross-examination that "attacked" or "took away from Mr. Welch's credibility." Furthermore, the circuit court found that the testimony of Welch was consistent with the statements given by Patricia and Tarsha to Miller. This evidence was not "so manifestly false that reasonable men ought not to believe it" or "shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ." *Id*. at 415, 626 S.E.2d at 417. Accordingly, we will not disturb the circuit court's credibility determination.

## III. CONCLUSION

For the foregoing reasons, we will affirm the judgments of the Court of Appeals upholding the Geralds' convictions.

Record No. 161844 – *Affirmed*.

Record No. 170356 – *Affirmed*.

---

[14] Tarsha speculates that because Welch was heading east bound in the afternoon, "the sun would necessarily be to his back and glaring in his rear-view mirror" making it "simply impossible" to observe the actions of Patricia and Tarsha; that Welch was "shaken up by the matter;" and, that his perceptions were "colored and clouded" by financial considerations of a potential civil suit.

19