# COURT OF APPEALS OF VIRGINIA

**Record No. 0304-25-2**

ALBERT ODELL STEWART

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Beales, O'Brien and Ortiz

Argued at Richmond, Virginia

Opinion Issued May 12, 2026[*]

**FROM THE CIRCUIT COURT OF KING GEORGE COUNTY**
Sarah L. Deneke, Judge

(Alexander Raymond, on brief), for appellant. Appellant submitting on brief.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**MEMORANDUM OPINION BY**
**JUDGE RANDOLPH A. BEALES**

A jury convicted Albert Odell Stewart of second-degree murder and aggravated malicious wounding. The trial court sentenced him to 60 years of incarceration, with 20 years suspended. On appeal, Stewart challenges the sufficiency of the evidence to sustain his convictions.

BACKGROUND[2]

In 2022, the victim, Laura Combs, was a paid confidential informant for the Tri-County Narcotics Task Force, which operated in Westmoreland County. Stewart was a target of the task

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74

force, as he was suspected of selling crack cocaine. On April 26 and June 21, 2022, the task force set up "buy-walk operations" in which Combs, acting undercover, purchased narcotics from Stewart. On October 19, 2022, as a result of these operations, Stewart was indicted for drug distribution. After Stewart was indicted but before he was arrested, information about the indictments was released on Facebook, with the Westmoreland County Sheriff's Office's consent. The Sheriff's Office offered to relocate Combs to "a hotel or somewhere out of town" for her safety "until things cooled off," but she declined.

Combs lived with her sister and mother. Her sister testified that on October 30, 2022, Combs answered a phone call, got dressed, and left their home. She did not return home that night, and on November 3, 2022, her sister filed a missing persons report.

Timothy McDowney owned a wooded property in King George County. The entrance to the property was gated, and the gate was secured by a combination lock. McDowney permitted certain people to enter and use the property, including Stewart. McDowney had given Stewart the combination to the lock as Stewart had helped McDowney with some landscaping work on the property in the summer of 2022.

McDowney had also given the combination to William Pryor so he could hunt on the property. On November 3, 2022, the same day Combs was reported missing, Pryor was hunting on the property when he found a dead body in the woods a quarter of a mile from the gate. The body was later identified to be Laura Combs.[3]

---

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[3] Combs's body was so severely decomposed that her face was unrecognizable, but the police identified her from a scar from heart surgery and a tattoo.

McDowney gave police consent to search the property. Detectives from the King George County Sheriff's Office arrived and examined the body. Combs's body was covered in a thick layer of brush, and her head was so decomposed that it "had no visible identifying features." The level of decomposition suggested that her body had been there for at least four days. Detectives observed "multiple stab wounds on the arms, hands, and also on her torso," that "her skull appeared to be fractured," and "her neck appeared to be cut." Combs's body was clothed in leggings and socks, and her torso was bare except for a bra. Detectives found a jacket and a shirt beside the body, which were "completely soaked with blood" and had "holes consistent with lacerations." The medical examiner determined that Combs's death was caused by multiple sharp force and blunt force injuries.

Detectives found Combs's cell phone several miles away on the side of Pomona Road. Combs's phone records showed that on the evening of October 30, 2022, she received two calls from the phone of Richard Jimmie West. West lived nearby on Pomona Road.

Lieutenant Detective Drew Massey of the King George Sheriff's Office first spoke with West on November 4, 2022. Initially, Detective Massey thought West "wasn't forthcoming" and that he "was holding back." Detective Massey thought "he was scared to tell me or scared of something." West initially denied calling Combs, and then said he was not sure. He later admitted to calling her but denied seeing her on October 30, 2022.

On November 5, 2022, detectives obtained a search warrant for West's residence. They found a black GMC Yukon which "appeared very clean, like it had been recently cleaned." As Detective James Belcher was examining the vehicle, he "looked under the rear bumper and observed what I believed to be blood." Detectives found cleaning products and rags in the back of the vehicle. They also found a hammer in West's bedroom.

- 3 -

Detective Massey spoke with West again during the search of his home. In this conversation, Detective Massey "could tell he was scared." West ultimately admitted that he had seen Combs on October 30, 2022, and that Stewart had also been there. West told detectives that they went to Stewart's trailer and used drugs and that he then left Stewart and Combs there and went home. After detectives confronted West with the hammer they found in his home, West admitted that he had lied and told them that Stewart had been the one who killed Combs.

Following that conversation with West, Detectives then went to Stewart's trailer. They arrested Stewart and searched the trailer pursuant to a search warrant. They found a folding knife in Stewart's trailer and a burned rag on a grill outside of the trailer.

West testified at trial.[4] He testified that Combs was "a very good friend" who he had known for eight years. He testified that after he was diagnosed with diabetes, she moved in with him, and that she "cooked for me, cleaned my house for me, gave me my insulin."

West testified that on October 30, 2022, he was socializing with Stewart when Stewart asked to use West's phone, as his was broken. West testified that Stewart called Combs from his phone and invited her to come out and get high with them. Stewart told Combs that West would pick her up. West then drove in his black GMC with Stewart to pick Combs up, and they went to a location and used drugs together.

West testified that Stewart then said, "I know a place we can go where we don't have to worry about the police and shit coming along." Stewart directed West to drive to McDowney's property, where he opened the padlocked gate, allowed West to drive through, and closed the gate behind the car. West testified that he knew McDowney but had never been to his property. He denied knowing the combination to the padlock.

---

[4] West was incarcerated at the time of Stewart's trial on charges related to Combs's killing.

- 4 -

Stewart directed West to follow the road, and West parked the car. West testified that "we were sitting there getting high. I was listening to my radio and everything and Laura was talking, we were laughing and everything." Then, West testified, Stewart got out of the car and said, "Laura, he said come here, I want to see you for a minute." When Combs resisted, Stewart said, "Laura, goddamn it, come here, I want to see you for a minute." Stewart then "reached in and grabbed her" and pulled her out of the car.

West stayed inside the vehicle listening to the radio, but he "could hear them talking." After a while, West "turned my radio up, I didn't want to hear what they were doing." After Stewart and Combs had been outside the car for a while, West heard the hatchback open. He testified, "When I got to the back end of my truck I could see her laying up on the ground." He saw Stewart "coming out the edge of the woods" with a knife in one hand and West's hammer in the other. West testified that "his hand was bloody." He said to Stewart, "what the fuck you did, man, kill the girl[?]" Stewart responded, "yeah, the white bitch going to snitch on nobody else." When West asked Stewart, "how the fuck you know she snitched on somebody," Stewart responded, "Because she snitched before." West told Stewart to clean off his hammer with a rag. West kept the hammer, but told Stewart he could keep the rag. West testified, "We stopped on the side of the road and he threw her phone in the woods."

West then drove Stewart back to his mobile home. Stewart said he would burn the rag on his grill in the morning. The next day West took the hammer inside his house to use for carpentry projects. A few days later, West took his car to a car wash.

West testified that he did not call the police because he was "scared for my life." He testified, "I just seen the man kill somebody, what would you think he would do to me if he knew I was going to call the police[?]" On cross-examination, counsel for Stewart asked if West lied to police because he was scared, West responded, "Well, if you just seen somebody kill

somebody, what would you think" and "if he killed her, what do you think he would have did to me."

On February 27, 2023, detectives interviewed Stewart. Stewart admitted that he called Laura using West's phone—and that they had all spent time together using drugs that night. He admitted that they went to McDowney's property that night. Crucially, he "admitted that he knew Laura was working for the police" and that "he had heard that they had found a hammer in Jimmie's [West's] vehicle."

On June 2, 2023, Stewart made a call from jail. In this call, he stated that "Laura got me" in April and June.

The Commonwealth also presented cellphone location evidence, which placed both Combs's and West's cellphones at the gate to McDowney's property from 8:18 p.m. to 9:16 p.m. on October 30, 2022. From 9:16 p.m. to 9:55 p.m., both cell phones were at Stewart's trailer. The cellphone records also showed that Combs's cellphone was placed where it was ultimately found at 11:42 p.m.

The Commonwealth likewise presented evidence of the forensic testing conducted on the hammer, the knife, and the rear bumper of West's vehicle. Combs was genetically linked to material found on the hammer. In addition, Combs's genetic material was found in the blood stain from the rear bumper of West's vehicle. Stewart could not be eliminated as the major contributor to DNA on the blade of the knife recovered from his residence.

While incarcerated awaiting trial, Stewart shared a cell with John Zinno, who testified at trial for the Commonwealth. According to Zinno, Stewart told him that "he was here for a murder charge, it was a woman who set him up, she had gotten him and fifteen other people arrested." Zinno stated that Stewart commented "how stupid his codefendant was" because "he was supposed to get rid of the hammer that he used to kill her, he was supposed to get rid of the

cellphone, but he still had all of those things on him." When the attorney for the Commonwealth clarified, "Mr. Stewart was talking about that he killed her?" Zinno responded, "Yes." Zinno testified that Stewart called Combs from West's phone, they went to pick her up, and when she "tried to get out of the car, . . . they wouldn't let her out of the car." Zinno testified that Stewart told him that "they took her in a car and, you know, killed her on the side of the road." Zinno testified that Stewart said he used a hammer to commit the murder, but that he also "said something about stabbing." Zinno testified that he asked Stewart if it was hard to "stab somebody that you've known your whole life," and Stewart responded, "it wouldn't be any harder than stabbing you if I find out you're working for the mother fucking police."

Zinno admitted that he waited to tell detectives what Stewart had said "until I was being transported out to Charlottesville." He denied learning anything about the case from anyone but Stewart. Detective Massey confirmed that he never mentioned specifics about the case to Zinno because "I wanted to make sure that what Mr. Zinno was going to tell me was credible, was something he learned on his own." Zinno denied that he had been promised anything in return for his testimony, but stated, "I've got some court troubles myself, you know, I was thinking that maybe it would, it would help, you know what I mean, if I reached out."

The jury found Stewart guilty of second-degree murder and aggravated malicious wounding. He was sentenced to 60 years of incarceration with 20 years suspended.

ANALYSIS

On appeal, Stewart argues, "The trial court erred by finding that the Commonwealth had produced sufficient evidence to prove that Mr. Stewart was the person who maliciously wounded the victim when the evidence was based on inherently incredible testimony." He also argues, "The trial court erred by finding that the Commonwealth had produced sufficient evidence to prove that Mr. Stewart was the person who murdered the victim when the evidence was based on

- 7 -

inherently incredible testimony." Stewart contends that both West and Zinno, the primary witnesses who implicated him, had "their own respective reasons to color their testimony" and blame him for Combs's killing. Thus, Stewart maintains, "the Commonwealth's evidence relied on the credibility of two inherently flawed witnesses."

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).

The only relevant question for this Court on review "is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Bowman v. Commonwealth*, 290 Va. 492, 496-97 (2015) (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

"[D]etermining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "An appellate court 'must accept "the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'"'" *Hammer v. Commonwealth*, 74 Va. App. 225, 239 (2022) (quoting *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019)). "Evidence is not

'incredible' unless it is 'so manifestly false that reasonable [people] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

## I. Testimony of Richard Jimmie West

Stewart argues that West's testimony was inherently incredible because he "had every reason to place the blame on Mr. Stewart."

"As our Supreme Court has held, a 'jury if satisfied of guilt, may convict an accused upon the uncorroborated testimony of an accomplice.'" *Holmes v. Commonwealth*, 76 Va. App. 34, 52 (2022) (quoting *Dillard v. Commonwealth*, 216 Va. 820, 821 (1976)). "A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (citing *Juniper*, 271 Va. at 415). "The mere fact that a witness may have delayed in reporting knowledge of a case or given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper*, 271 Va. at 415. Any inconsistencies in a witness's testimony are "appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine." *Id.*

West's testimony was not inherently incredible as a matter of law. While West certainly equivocated when speaking to police about the events of October 30, 2022, we do not find these equivocations to render his entire testimony "so manifestly false that reasonable [people] ought not to believe it." *Gerald*, 295 Va. at 487 (quoting *Juniper*, 271 Va. at 415).

Here, West's testimony showed that Stewart, who had the motive to kill Combs, used West's phone to call Combs, drove with West to pick Combs up, and instructed West to drive them to a secluded location, where only he knew the combination to the padlock on the gate. Once there, Stewart forced Combs from the vehicle, and using a hammer and a knife, fatally injured her. West saw Combs's body on the ground near the woods and saw Stewart emerging from the woods with bloody hands. West explained that he did not call the police because he was afraid that Stewart—whom he had just witnessed murder Combs for cooperating with the police—would likewise harm him for cooperating with the police.

Furthermore, we also cannot say that West's testimony was "shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ." *Gerald*, 295 Va. at 487 (quoting *Juniper*, 271 Va. at 415). In fact, West's testimony was corroborated by other evidence presented at trial. West's version of events was corroborated by the Commonwealth's cell phone location evidence, as well as by Zinno's testimony. West's testimony that Stewart told him that he would burn the bloody rag on his grill was corroborated by the police's discovery of a burnt rag on the grill outside Stewart's trailer. The forensic evidence—Combs's DNA on the hammer and the bumper of West's car—likewise corroborated West's testimony about how and where Stewart killed Combs.

Any "'[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." *Kelley*, 69 Va. App. at 626 (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). West's testimony, its inconsistencies, and his motivation for lying were all credibility questions for the jury to determine that we do not disturb on appeal.

## II. Testimony of John Zinno

Stewart argues that Zinno's testimony was "inherently flawed" because "Mr. Zinno lied to get a better outcome in his court proceedings."

"A person convicted of a felony or perjury shall not be incompetent to testify, but the fact of conviction may be shown in evidence to affect his credit." Code § 19.2-269. Prior felony convictions do not render a witness's testimony inherently incredible as a matter of law. *Yates v. Commonwealth*, 4 Va. App. 140, 144 (1987).

In this case, counsel for Stewart had the opportunity to cross-examine Zinno about his motives for testifying. In addition, Detective Massey confirmed that he never mentioned specifics about the case to Zinno because "I wanted to make sure that what Mr. Zinno was going to tell me was credible, was something he learned on his own." In weighing the evidence of the case and determining Zinno's credibility, the jury considered whatever motive Zinno may have had in testifying against Stewart.

In addition, neither Zinno's status as a convicted felon nor his hopes for leniency in exchange for his testimony render his testimony inherently incredible. Much of Zinno's testimony—particularly that Stewart knew that Combs was working with the police and that he used a hammer as a murder weapon—was corroborated by other evidence. The phone call from jail, where Stewart stated that "Laura got me," corroborated Zinno's testimony that Stewart knew that Combs was cooperating with police. Stewart himself even admitted to Detective Massey that he knew that Laura was working with the police. In addition, DNA evidence corroborated Zinno's testimony that Stewart used a hammer to kill Combs. Finally, West's and Zinno's accounts are largely consistent with one another. They both stated that Stewart knew of Combs's cooperation with the police and that Stewart used a hammer and knife to kill Combs on the side of a dirt road in a remote location.

We therefore cannot say that Zinno's testimony was "so manifestly false that reasonable [people] ought not to believe it" or "shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ." *Gerald*, 295 Va. at 487 (quoting *Juniper*, 271 Va. at 415).

## CONCLUSION

In determining the witnesses' credibility, the jury was entitled to consider whatever possible motivations West and Zinno may have had in testifying against Stewart. However, both witnesses' accounts were corroborated by other evidence presented by the Commonwealth. We therefore cannot say that their testimony was so contrary to human experience as to render it unworthy of belief. Considering all of the facts and circumstances, the trial testimonies of West and Zinno were certainly not inherently incredible as a matter of law, and the jury was entitled to conclude beyond a reasonable doubt that Stewart was guilty of the aggravated malicious wounding and murder of Laura Combs.

For all of the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*