COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:    Judges O'Brien, AtLee and Senior Judge Clements
Argued by teleconference


ADRIAN DONNEL ALEY

                                                              OPINION BY
v.      Record No. 0693-21-4              JUDGE RICHARD Y. ATLEE, JR.
                                                              JUNE 14, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge

(G. Price Koch; Spencer Meyer & Koch PLC, on brief), for
appellant.  Appellant submitting on brief.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted appellant Adrian Donnel Aley of felony hit-and-run involving personal

injury and felony eluding, in violation of Code §§ 46.2-894 and 46.2-817(B), respectively.[1]  The

trial court denied Aley's subsequent motion to set aside the verdict and sentenced Aley to serve six

months and thirty days in jail.  On appeal, Aley challenges the sufficiency of the evidence to sustain

his convictions.  For the following reasons, we affirm the trial court's judgment.

I. BACKGROUND

In accordance with familiar principles of appellate review, we state the facts "in the light

most favorable to the Commonwealth, the prevailing party at trial."  *Gerald v. Commonwealth*, 295

Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).  In doing so, we

---

[1] Aley does not challenge his convictions for reckless driving by endangerment and
reckless driving by speed arising from the same incident.  At trial, the circuit court dismissed an
abduction charge and a second reckless driving by endangerment charge.

discard any of Aley's conflicting evidence and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

At 12:20 a.m. on May 6, 2020, Stafford County Sheriff's Deputies Scott Fulford and Colby Thomas were driving eastbound along White Oak Road[2] when a "white sedan,"[3] traveling in the same direction as the deputies, "blew past" their patrol vehicle "at an extremely high rate of speed." The highway had a posted speed limit of fifty miles per hour. The road had meandering curves and was "extremely dark at night" because it had "no lights on it." The deputies lost sight of the speeding car before they could begin pursuit and, instead, began searching for a crash because they believed the driver had been traveling too fast to negotiate the curves in the road.

At 12:38 a.m., the deputies encountered the white car again, as it "came around [a] corner" on White Oak Road, accelerating toward them at what radar confirmed was ninety miles an hour, before turning right at an intersection. Deputies Fulford and Thomas performed a U-turn and attempted to initiate a traffic stop, activating their patrol car's emergency lights, but not its siren, as they pursued the speeding car down Bethel Church Road. The deputies accelerated "up to a hundred miles an hour" and approached to within "a couple hundred yards" of the car, but it "kept pulling away" until they "eventually lost sight of it."

Aley's girlfriend, Krista Jacobs, testified at trial that at 12:15 a.m. that same morning, Aley picked her up from her house in his "S5 white Audi" to drive her to his parents' house near Bethel Church Road. Sitting in the front passenger seat as Aley drove eastbound along White Oak Road,

---

[2] The witnesses at trial referred to this highway interchangeably as "White Oak Road" and "VA-218." For consistency, we refer to the highway as White Oak Road.

[3] Aley emphasizes that his vehicle was an Audi S5 coupe, not a "sedan" like the deputies observed; however, viewing the evidence as we must, it is reasonable to infer that the deputies did not focus on the number of doors on a car being driven at such a dangerous speed, and instead simply took notice that Aley's car was shaped like a sedan.

Jacobs noticed that Aley began "driving very fast," exceeding sixty-five miles per hour along the winding highway.

Shortly before 12:30 a.m., Jacobs grew "afraid for [their] safety" as Aley passed the turn for their destination and "the speed seemed to increase." Aley briefly pulled over, and Jacobs admonished him to "[never] do that with [her] in the car ever again." In response, Aley told Jacobs that driving like that was "an adrenaline rush," checked her safety belt to ensure that it was secured, and reclined Jacobs' chair "as if to relax [her]" before resuming driving. Aley drove in "the opposite direction" and, again, passed the turn for their destination. Jacobs felt "really scared and nervous." Aley reassured her that he "just want[ed] to drive around and listen to a couple songs" before going home.

Jacobs became apprehensive when Aley, again, increased his speed to over sixty-five miles per hour as they drove westbound on White Oak Road. Aley continued to accelerate and "came up very quickly behind a car," prompting Jacobs to "yell[] his name" in fear that he was "going to rear-end" the motorist. Aley "just looked at [Jacobs] and swerved around the vehicle." Aley then exclaimed "oh shit . . . there is cops, I have got to run" as he took a "sharp right-hand turn" onto Bethel Church Road.

Jacobs "turned around and looked over [her] shoulder" to discover flashing blue lights, which she understood meant that "there was a police officer" pursuing them. Jacobs testified that "it didn't seem like [the police] were very far" behind their car when she first noticed them; later, the "blue lights" appeared more distant when Jacobs looked in the mirror, but she still could see them. Aley refused to pull over despite Jacobs urging him to do so.

At approximately 12:45 a.m., Aley "hit the brakes a little bit" as the car "came around a turn." He exclaimed "oh, no, we are going to crash" and "threw his arm over [Jacobs]" as they went off the road. At that point, Jacobs surmised that the car "flipped" because she could see "objects

flying up in the car" and "everything sort of inverted." A hard object struck the left side of Jacobs' head and face while the vehicle was airborne. The car eventually "landed right side up," Jacobs saw "airbags everywhere," and the couple got out of the car.

Jacobs discovered that she had "somehow lost one of [her] shoes" during the crash. Her "head hurt," and the upper part of her left arm was "throbbing." Jacobs noticed Aley's head was bleeding, which "kept getting worse" and blood was "pouring out." Aley apologized to Jacobs and "asked if [she] was okay." He told her to follow him to an adjacent wooded area. Jacobs initially refused, citing her missing shoe as an excuse to remain at the scene because she "was afraid to actually say no to him." Aley attempted to carry Jacobs, but he abandoned the effort after failing to lift her. The couple ran over to a small clearing in the woods, but they had to return to the car so Aley could "get[] some things out" and Jacobs could retrieve her cell phone. They then returned to the woods to hide, with Aley telling Jacobs that "if the cops show up[,] we have to run."

Jacobs told Aley they "need[ed] to go to the hospital several times, because [she] knew that [she] was hurt, [she] could see that he was hurt, and [they] both needed medical attention." Aley repeatedly refused. Jacobs tried to call her friend, Connor Buchanan, for medical assistance because he was a trained paramedic, but Aley "yelled at [her] to get off [her] phone." Aley called his brother, who arrived approximately ten minutes later and drove the couple to his parents' house. During that time, Jacobs was too "afraid" to call 911 or the police to report the crash because Aley kept "saying [they] had to run from the cops."

Around 1:15 a.m., the couple arrived at Aley's parents' residence. Aley spoke to his brother in the kitchen "about what had happened" while Jacobs requested a first aid kit to clean Aley's head wound. Jacobs called Buchanan, told him that she had been in a car accident, described her injuries, and requested that he "take [her] to the hospital." He agreed, but she later changed her mind when she realized that Aley would not come with her because she "felt like [she] couldn't just leave

- 4 -

without knowing that he was okay. So [she] wanted him to stay awake and not go to sleep so [she] could make sure nothing was seriously wrong" as a result of Aley's head wound. Jacobs treated Aley's wounds and encouraged him to go to the hospital, but Aley "kept insisting that he wasn't going."

Around 7:00 a.m., a passerby noticed a "heavily damaged" vehicle "off the road into the tree line" abutting Bethel Church Road approximately two miles from White Oak Road. "[B]ecause of the significance of the damage to the vehicle," the citizen called the Stafford County Sheriff's Office out of "concern[] that people . . . may be trapped in the vehicle." In response, Captain Lee Peters, III, arrived at Bethel Church Road to discover a totaled white "2019 Audi"—Aley's car— in the woods by the highway with its hazard lights activated. The car was unoccupied. From "the [car's] significant damage," along with the fact that its "four-ways were still flashing" and "every airbag" had deployed, Captain Peters concluded that the collision "was relatively recent."

Relying on his training and experience in vehicular accident reconstruction, Captain Peters determined from the presence of "yaw marks"[4] in the terrain that Aley's car had "slid" off the pavement and careened through several trees and nearby fencing before crashing approximately 300 feet from the roadway. The lengthy distance and absence of tire marks between "where the tires first left the road to where the vehicle stopped" indicated that the car "was traveling rapidly" when it ran off the road, and the driver had not pressed on the brakes or turned the steering wheel to avoid the crash.

Captain Peters searched the car and found the driver's side seatbelt in an "out and locked" position, "blood on the driver airbag," a "seatbelt hanging out of the passenger door," and "specks of blood on the passenger side of the seatbelt." Captain Peters concluded from that evidence that a

---

[4] Captain Peters testified that the term "yaw mark" refers to disturbances in the ground resulting from "tires moving in a direction trying to gain traction where there is none, as the vehicle continues in a certain direction."

driver and front passenger had recently occupied the vehicle and were both injured. Later at trial, Captain Peters emphasized that it was obvious that the collision involved personal injury, testifying "if you look at the car, you look at the seatbelts, and look at the blood, you look at the damage to the car, you understand the human body is not designed to take that type of trauma in a crash."

Using information from the car's license plate and associated DMV records, Captain Peters ascertained that Aley was its registered owner. Shortly thereafter, Captain Peters ordered a tow truck to remove the car and traveled to Aley's last known address, where he spoke to Aley's father. Captain Peters informed the father that he was searching for injured parties from the crash but departed to continue his investigation after Aley's father "told [him] that [the car's occupants] weren't there."

At some point that morning, Aley went upstairs to speak to his father. From downstairs, Jacobs heard Aley say, "I didn't do it, it was my friend driving." Aley returned downstairs and told Jacobs that the police had come to the house looking for him twice that morning. He said that the first time, his brother told the police that Aley was in Harrisonburg. The second time, Aley's father spoke to the police. He informed Aley that "the police knew that he was the one driving, that it was his vehicle," and "that they were aware of what had happened." When Jacobs told Aley that he should "just tell the truth," he became angry and said, "I'm not talking to no cops." Jacobs described his demeanor as "upset, and almost like a child that was being scolded."

Around noon, Buchanan picked Jacobs up and drove her to her parents' home. While en route, Jacobs passed the crash scene and saw that Aley's car was no longer there. Thinking that her personal belongings, including her wallet and keys, may still be inside the vehicle, Jacobs sent Aley a text message requesting that he "find out where [his car] went." Aley replied, "I just have some things to do first." Buchanan briefly stopped at Jacobs' parents' home before driving her to the hospital emergency room.

- 6 -

At the hospital, clinicians performed a physical examination of Jacobs' wounds and ordered blood work, a CT scan of Jacobs' chest, and an "X-ray of [her] left humerus." After leaving the hospital, Jacobs sent Aley a text message indicating that her CT scan and X-ray "were good" and she was "okay." Buchanan then transported Jacobs to his parents' home, where she discussed what had taken place and ultimately "let [Buchanan] and his father call the police."

A little after 5:00 p.m., Captain Peters arrived at the Buchanan residence to meet with Jacobs. Jacobs "was in tears" and "appeared scared," "uncomfortable," and "injured" during their conversation. Her face was "red" and "swollen," and "it looked like a boxer had punched her in the face." Jacobs also had visible, red "seatbelt marks" cutting diagonally across her body from right to left, suggesting to Captain Peters that she had been "a passenger seat victim in a crash." Another deputy photographed Jacobs' injuries, which included "a cut on [Jacobs'] back near the right shoulder" and "swelling" on the upper part of her arm that "was very painful with every movement." Additionally, Jacobs had "scrapes on [her] arm," a "cut on [her] forehead," "bruising on [her] leg," and "a cut on [her] knee." Her left eye was swollen, and the left side of her jaw "hurt very much," such that she could not chew or eat "for at least a week." Jacobs testified that none of these injuries existed before the crash.

After meeting with Jacobs, Captain Peters sent a text message to Aley advising him to return his call. In the text message, Captain Peters warned Aley, "I'm about to get warrants for your arrest as well as the folks who lied to me to protect you this morning." Aley did not respond to the text but subsequently turned himself in to authorities.

At trial, following the conclusion of the Commonwealth's case-in-chief, Aley moved to strike. He argued that the evidence failed to prove the felony eluding charge because the police cruiser "was a hundred to a couple hundred yards behind [Aley]," a "distance [that] is just as a matter of law too far" for emergency lights alone to qualify as "a signal to bring a vehicle to a stop

specific to this car." The trial court overruled the motion, concluding that there was sufficient evidence for the matter to go forward to the jury. Aley declined to present evidence, and the trial court denied Aley's renewed motion to strike on the same grounds. The jury convicted Aley of felony hit-and-run and felony eluding.

At a hearing on Aley's subsequent motion to set aside the verdicts, Aley argued that the Commonwealth failed to prove that he knew or should have known of Jacobs' injuries because she never "communicated her injuries" to him and they were "not visible" the day of the incident. Aley also reiterated his argument that police were "never within the required distance [of him] to actually signal that this car must pull over or received a signal." The trial court denied the motion, concluding that it "cannot find that as a matter of law the jury's verdict is contrary to the existing law or the facts that were presented." This appeal follows.

## II. ANALYSIS

Aley challenges the sufficiency of the evidence to sustain his convictions. Relying on our decisions in *Brannon v. Commonwealth*, 52 Va. App. 800 (2008), and *Neel v. Commonwealth*, 49 Va. App. 389 (2007), Aley argues that the Commonwealth failed to prove he knew or should have known that the accident involved personal injury as required for a conviction of felony hit-and-run. Aley also contends that "nothing on the record indicated" that he received "a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop," which was necessary to establish felony eluding. We address each argument in turn.

### A. *Standard of Review*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting

*Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

B. *The evidence proved Jacobs requested that Aley help her seek medical treatment.*

Aley addresses the narrow issue of whether he reasonably knew or should have known that Jacobs suffered any injury from the accident. Specifically, he contends that "there is no evidence that [Jacobs'] injuries were known to Aley at the time of the accident or shortly thereafter" because Jacobs never told Aley she was injured and her wounds were not apparent. We disagree.

Code § 46.2-894 provides, in pertinent part, as follows:

> The driver of any vehicle involved in an accident in which a person is killed or injured . . . shall immediately stop as close to the scene of the accident as possible without obstructing traffic, as provided in § 46.2-888, and report his name, address, driver's license number, and vehicle registration number forthwith to the State Police or local law-enforcement agency, to the person struck and injured if such person appears to be capable of understanding and retaining the information, or to the driver or some other occupant of the vehicle collided . . . . The driver shall also render reasonable assistance to any person injured in such accident, including taking such injured person to a physician, surgeon, or hospital if it is apparent that medical treatment is necessary or is requested by the injured person.

A violation of the statute that results in "the injury or death of any person" is punishable as Class 5 felony. Code § 46.2-894(i).

Our case law discussing Code § 46.2-894 has primarily analyzed what it means for it to be "apparent that medical treatment is necessary," discussing factors indicating that an appellant knew or should have known to seek medical treatment. *See Brannon*, 52 Va. App. at 804 ("[K]nowledge of injury may be imputed to a driver 'where the fact of personal injury is visible or where the seriousness of the collision would lead a reasonable person to assume there must have been resulting injuries.'" (quoting *Neel*, 49 Va. App. at 395)). Yet the statute also provides that the duty to render reasonable assistance, including obtaining medical attention, exists not only "if it is apparent that medical treatment is necessary" but also if it "*is requested by the injured person*." Code § 46.2-894 (emphasis added). The statute uses the disjunctive "or," meaning that either condition may satisfy that element of the offense. *See Williams v. Commonwealth*, 61 Va. App. 1, 8 (2012) ("[T]he use of the disjunctive word 'or,' rather than the conjunctive 'and,' signifies the availability of alternative choices." (alteration in original) (quoting *Rose v. Commonwealth*, 53 Va. App. 505, 514 (2009))); *Wright v. Commonwealth*, 53 Va. App. 266, 282 (2009) ("The word 'or' connects two parts of a sentence, 'but disconnects their meaning.'" (quoting *Smoot v. Commonwealth*, 37 Va. App. 495, 501 (2002))).

Here, the evidence is overwhelming that Jacobs repeatedly asked Aley to take her to the hospital in the hours following the crash. Jacobs testified that she told Aley they "need[ed] to go to the hospital several times, because [she] knew that [she] was hurt, [she] could see that he was hurt, and [they] both needed medical attention." Aley repeatedly, and often angrily, refused. Furthermore, Aley yelled at Jacobs when she tried to call Buchanan, a trained paramedic, for assistance right after the crash. Contrary to Aley's assertions before the trial court and on appeal, Jacobs did not have to detail the exact nature and extent of her injuries to trigger the "reasonable

assistance" provisions under Code § 46.2-894. It is sufficient that she clearly and repeatedly requested that Aley take her to receive medical attention and that Aley refused to do so.

C. *The evidence proved that Aley received a visible signal from a law enforcement officer to bring his motor vehicle to a stop.*

Aley next argues that the evidence failed to demonstrate that he received "a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop," which is necessary to establish felony eluding. On brief, as in the trial court, Aley argues that police were too far behind his car during the pursuit for him to have "receive[d] any valid signal . . . to yield or stop." We disagree.

Code § 46.2-817(B) provides, in pertinent part:

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony.

Under that statute, the Commonwealth must prove that "the accused received a visible or audible signal from a law enforcement officer to bring the motor vehicle to a stop." *Jones v. Commonwealth*, 64 Va. App. 361, 367 (2015).

Here, the record firmly supports the trial court's finding that Aley received a visible signal to stop within the meaning of the statute. Deputy Fulford testified that he and his partner attempted to initiate a traffic stop by activating their patrol car's "emergency lights" as they pursued Aley's car down Bethel Church Road. The deputies tried to catch up to the vehicle, driving 100 miles per hour to do so, and approached to within "a couple hundred yards, a hundred yards" of the car before it "pull[ed] away" and they "eventually lost sight of it." Furthermore, just before the pursuit, Aley exclaimed, "Oh shit . . . there is cops, I have got to run." Immediately thereafter, Jacobs "turned around and looked over [her] shoulder" to discover

- 11 -

flashing blue lights, indicating that the police were pursuing them.  Jacobs testified that the

police were not "very far" behind their car when she initially noticed them, and she was able to

see them even as the officers lost ground during pursuit.  Moreover, during the chase, Aley

insisted, "I can't pull over," despite Jacobs' pleas that he do so.  That collective testimony

overwhelmingly establishes that Aley received a visible signal from law enforcement to stop his

motor vehicle as required for conviction under Code § 46.2-817(B).  *Cf. Jones*, 64 Va. App. at

368-69 (finding sufficient evidence of defendant's receipt of a visible signal to stop where police

activated their patrol car's emergency lights, which "remained activated" throughout the

encounter).

Additionally, the trial court could reasonably infer Aley's "consciousness of guilt" from

his efforts to avoid detection following the wreck.  *See Palmer v. Commonwealth*, 14 Va. App.

346, 348-49 (1992) ("[I]t is today universally conceded that the fact of an accused's flight,

escape from custody, resistance to arrest, concealment, assumption of a false name, and related

conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself." (alteration

in original) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991))).  Immediately

after the crash, Aley told Jacobs to follow him from the accident into the woods because "if the

cops show up[,] we have to run."  Later, Aley attempted to conceal himself from authorities at

his parents' house and allowed his relatives to lie to police on his behalf.  Aley's brother told

police that Aley "was in Harrisonburg," and his father told police that no one involved in the

crash was at the house when Aley was actually hiding with Jacobs in his downstairs bedroom.

Furthermore, when Jacobs encouraged Aley to abandon his efforts to escape and "just tell the

truth" to the police, he angrily responded, "I'm not talking to no cops."  That testimony

establishing Aley's efforts to escape, conceal himself, and allow others to lie to the police

evinces his "consciousness of guilt," *Palmer*, 14 Va. App. at 349, and further supports the trial court's finding Aley guilty of felony eluding.

### III.  CONCLUSION

For the foregoing reasons, we affirm Aley's convictions.

*Affirmed*.