UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Friedman and Callins
Argued at Richmond, Virginia


DAVID REGINALD JONES

                                              MEMORANDUM OPINION* BY
v.      Record No. 0321-22-2                  JUDGE RANDOLPH A. BEALES
                                                   DECEMBER 29, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Kimberley S. White, Judge[1]

John A. Terry (Bagwell & Bagwell, PC, on brief), for appellant.

Rebecca M. Garcia, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The Circuit Court of Halifax County convicted David Reginald Jones of assault and battery,

violating a protective order, trespassing, and abduction.  On appeal, Jones challenges the sufficiency

of the evidence to support his convictions.

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.

Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)).  As the Supreme Court has stated, "This principle requires us to 'discard the evidence of

the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences to be drawn therefrom.'"  *Kelley v.*

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The Honorable Kimberley S. White presided over the proceedings below.  Now a
member of this Court, Judge White took no part in this decision.

*Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

As established by her testimony at trial, P.L.[2] and Jones had been in a romantic relationship until a few months before July 2020. By that time, P.L. had ended her relationship with Jones and had told him repeatedly that he was not welcome at her home. Around 5:00 p.m., on July 17, 2020, P.L. took her medication and went to bed early because she was recovering from injuries sustained during a car crash. In addition, she suffered from chronic obstructive pulmonary disease (COPD) and severe bronchitis and had been using an oxygen tank since 2016.

A few hours after P.L. went to bed, Jones began calling her and sending her text messages asking her to give their relationship another chance, but she did not respond. At approximately 9:00 p.m., she noticed headlights shining through her window and thought that someone was pulling into her yard. She then walked to her bathroom window and saw a truck backing away from her house. At that moment, a video doorbell application on her phone alerted her that someone was near her door. Using her phone, she saw Jones approaching her door with a beer in his hand, so she rushed to the door and told him to leave. Jones refused to leave and stated that his ride had left, that he needed to talk with her, and that he suspected she was with another man.

When P.L. again insisted that Jones leave, he briefly faked walking away and then seized the door as P.L. tried to close it. P.L. further testified that Jones jerked the door open, positioned his body so that it could not close, and then announced that "he was not going anywhere." He then grabbed P.L. by her hair and pushed her from the doorway into the kitchen. P.L. stated that Jones forced her into the kitchen corner and raised her onto the tips of her toes by her hair. As Jones held her in the corner, he threatened to kill her while reaching into his back pocket, acting as though he

---

[2] We use initials, instead of the victim's actual name, in an attempt to better protect her privacy.

was going to pull out a gun. She then testified that Jones released her hair, yanked her oxygen cord from her head, and wrapped it around her hands.

After Jones released her, P.L. stated that she slumped to the kitchen floor and was struggling to breathe. She claimed that Jones then pressed a chair against her and sat in it "to make sure I didn't go anywhere." Next, for about three hours, Jones talked about "all that he wanted to do" so that they could get back together. She testified that she did not respond to Jones other than to beg for her life and to ask him to call an ambulance because she was "in so much pain." She added that, eventually, Jones began pacing in and out of the house, "acting like he was talking to someone outside." When Jones walked outside, she went to the door and locked it. P.L. then immediately called her adult daughter and asked her to call the police. P.L. next called her nearby landlord because Jones was banging on her door and trying to get into the house again.

At trial, in addition to P.L.'s testimony, the Commonwealth presented evidence, including a photograph of her injury, a photograph of her hair, records of Jones's messages to her, police body-worn camera footage, and additional testimony. Her landlord testified that when P.L. spoke to him on the phone, it "[s]ounded like something was really wrong."

Deputy Bush, of the Halifax County Sheriff's Office, testified that he was dispatched to P.L.'s house on the night of the incident and found her crying and shaking as she slid herself into a corner. She had redness on her face, around her neck, and down her arms. Deputy Bush's body-worn camera recorded his efforts to speak with her and depicted her crying and shaking on the living room floor. P.L.'s daughter testified that she arrived while Deputy Bush was in the house with P.L. and observed that her mother was shaking, crying, and sitting on the floor. She also stated that P.L.'s lip "was busted on the inside" and bruised.

P.L.'s daughter informed Deputy Bush that she had just seen Jones outside next to a deputy's car. Deputy Bush arrested Jones outside of P.L.'s house and drove him to the magistrate's

- 3 -

office. At 1:32 a.m. on July 18, 2020, the magistrate issued an emergency protective order that prohibited Jones from having contact of any kind with P.L. Deputy Bush served the protective order on Jones at 1:35 a.m.–three minutes after it was issued. Despite the protective order, Jones resumed calling and texting P.L. and sending her messages through Facebook within hours on the same morning the protective order was issued. Throughout these messages Jones called P.L. a liar, professed his love for her, and admitted that he had made a mistake after she had earlier closed her door in his face.

At the close of the Commonwealth's case-in-chief, after the Commonwealth had presented testimony from four witnesses, and had also presented photographs, copies of written messages, and other evidence, including Deputy Bush's body-worn camera footage, counsel for Jones moved to strike the evidence because it was not sufficient as a matter of law. The trial court granted the motion to strike as to the counts of breaking and entering and preventing another from contacting emergency services, but denied the motion as to the four counts that are the subject of this appeal.

Jones then testified in his own defense. He denied grabbing or dragging P.L. and claimed that he could not have prevented her from moving because he had a cast on his arm. He also denied threatening to kill her and insisted that he only wanted to know why she was cheating on him. Jones admitted that he attempted to pull her hair when she would not answer him, but that it "slid out" of his hand. Jones admitted that he was upset when he sent the text messages to P.L. after his arrest but denied that he intended to harm her. Counsel for Jones then renewed his motion to strike, arguing that the testimony of both P.L. and Jones had inconsistencies and that "the truth is somewhere between" both sides.

The trial court acknowledged Jones's renewed motion to strike but found that P.L.'s testimony was credible and that it was corroborated by the Commonwealth's other evidence. The trial court noted that P.L.'s daughter was upset and "had tears coming down her cheeks" as she

described her mother's condition shortly after the incident, which the trial court found to support the daughter's credibility. The trial court also found that Deputy Bush's testimony and body-worn camera footage demonstrated that P.L. was crying, was shaking, and was unable to stand up when he arrived, indicating that P.L. had experienced an exceedingly traumatic event. Accordingly, the trial court convicted Jones of assault and battery, violating a protective order, trespassing, and abduction. Jones appeals to this Court.

## II. ANALYSIS

On appeal, Jones contends that the evidence was not sufficient to support his convictions. When an appellate court reviews the sufficiency of the evidence, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Smith v. Commonwealth*, 296 Va. 450, 460 (2018). In such cases, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Instead, "[v]iewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party" below, *Riner v. Commonwealth*, 268 Va. 296, 330 (2004), we must ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc) (emphasis added). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

Jones argues that the evidence was insufficient to sustain his convictions because the Commonwealth's evidence was incredible. Specifically, he argues that the evidence consisted primarily of his and P.L.'s contradictory testimony and that "no other individuals" could "confirm [who] was telling the truth." He also argues that no evidence corroborated P.L.'s testimony and that

she had "a possible motive" to lie, given his allegation that he caught her with another man. Jones argues that his testimony, by contrast, was corroborated by Deputy Bush's body-worn camera footage, which depicted a cast on his arm, a circumstance that diminished his ability to commit the offenses in the manner that P.L. described.

"Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). In addition, as the present case illustrates, a "fact finder's evaluations of credibility" include "choosing between competing accounts offered by different witnesses." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011). In conducting those evaluations, the fact finder is "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004). A fact finder may also reject a defendant's self-serving testimony and "conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

"[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). However, as the Supreme Court has stated, "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

P.L.'s testimony simply was not inherently incredible. A witness's testimony is not inherently incredible when it is corroborated by other evidence, although corroboration is not necessary. *See Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019). Here, substantial evidence corroborated P.L.'s account. First, Deputy Bush's body-worn camera footage depicted P.L.'s clear distress. She was crying and shaking on her floor shortly after the incident. As the trial court found, that video evidence corroborated P.L.'s testimony by demonstrating that "what [she] had experienced was exceedingly traumatic." Second, her daughter's testimony and Deputy Bush's testimony demonstrated that, when they arrived, P.L. had a lacerated lip and redness on her face, around her neck, and down her arms. Those injuries were consistent with P.L.'s account of her struggle with Jones and the force he applied against her, including grabbing her by her hair, forcing her into a corner of the kitchen, yanking her oxygen cord from her head, and tying her oxygen cord around her hands. *See Ward v. Commonwealth*, 264 Va. 648, 653 (2002) (holding that a victim's "physical injuries" tend to "corroborate the victim's testimony").

Finally, Jones's own statements corroborated P.L.'s testimony. At trial, Jones conceded that he attempted to pull her hair although he tried to minimize his actions by claiming the hair slid out of his hand. Jones's text messages to P.L. the morning after the incident—which he sent in violation of the protective order prohibiting any contact with her—also corroborated P.L.'s account of what occurred. In written messages, Jones admitted that he had made a mistake and acknowledged that P.L. had tried to close her door without letting him into her home. Although Jones denied dragging P.L. by her hair, preventing her from moving, or threatening to kill her, the balance of the Commonwealth's evidence, including some of Jones's own statements, contradicted Jones's testimony. Thus, the trial court was entitled to reject Jones's version of the facts. *See Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008). After having seen and heard all the

witnesses and considering the evidence, including a video recording, the trial court accepted P.L.'s testimony.

Given P.L.'s testimony and Jones's own admissions—in addition to the Commonwealth's other evidence—the elements for each offense were clearly established. "Trespass is the unauthorized use of or entry onto another's property." *Kim v. Commonwealth*, 293 Va. 304, 317 (2017). A person is guilty of abduction if he, "by force . . . seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty." Code § 18.2-47(A). A protective order is violated when that order "prohibits contacts" with "the allegedly abused person" under Code § 16.1-253.2(A) and then the person against whom the protective order is issued nevertheless still establishes communication with that other person protected by the protective order. *See Green v. Commonwealth*, 72 Va. App. 193, 203 (2020). Finally, "[t]o sustain a conviction for battery, the Commonwealth must prove a 'wil[l]ful or unlawful touching' of another." *Parish v. Commonwealth*, 56 Va. App. 324, 330 (2010) (second alteration in original) (quoting *Wood v. Commonwealth*, 149 Va. 401, 404 (1927)). In addition, "[t]he unlawful intent may be imputed if the touching is done in a rude, insolent, or angry manner." *Id.* at 331 (quotation omitted).

Given the evidence in the record, it is clear that a rational fact finder could certainly conclude that Jones grabbed P.L., pulled her by her hair across the room, wrapped her oxygen tube around her hands, and kept her from leaving (or being where P.L. wanted to be) for several hours by trapping her in the corner of a room. P.L. had not invited Jones into her home, had told him he was not welcome, and had asked him to leave multiple times after he arrived. Consequently, there is plenty of evidence for a rational fact finder to find Jones guilty beyond a

reasonable doubt of assault and battery, abduction, and trespassing.[3] In addition, by 1:35 a.m. on July 18, 2020, the police had served Jones with an emergency protective order that Jones violated within hours that same day by texting and calling P.L. and by messaging her on Facebook.

Given that P.L.'s testimony was not inherently incredible, given that the Commonwealth's evidence was competent, and given that Jones admitted that he grabbed P.L.'s hair, went into her home after she had tried to shut the door on him when he arrived, and texted and called her after being served the emergency protective order, we certainly cannot say that no rational fact finder could have found the evidence sufficient to sustain Jones's convictions beyond a reasonable doubt.

## III. CONCLUSION

For all of the foregoing reasons, we affirm Jones's convictions by the trial court.

*Affirmed.*

---

[3] Jones also argues that the evidence was insufficient to convict him of trespassing because, as in *Reed v. Commonwealth*, 6 Va. App. 65, 71 (1988), Jones had a "good faith belief that" he had "a right to be on the premises." Contrary to Jones's argument, however, *Reed* does not control in the case now before us. First, Reed had an agreement of tenancy with the owner giving him a right to be on the property, but Jones had no such tenancy agreement here with P.L. *Id.* at 67. Second, P.L. asked Jones to leave her property multiple times, but he refused to do so. Third, Jones did not raise this specific argument before the trial court, and, therefore, he failed to preserve this argument for appeal. *See* Rule 5A:18; *Bethea v. Commonwealth*, 297 Va. 730, 743-45 (2019).