COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Friedman, Chaney and Lorish
Argued at Salem, Virginia


STEVEN WADE CARTER

MEMORANDUM OPINION[*] BY
v.      Record No. 0260-23-3          JUDGE LISA M. LORISH
                                        MAY 28, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

Mark T. Williams (Williams & Light, on brief), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A Pittsylvania County jury convicted Steven Wade Carter of six counts of rape, six counts
of object sexual penetration, and six counts of forcible sodomy. Under Code § 18.2-61(A)(iii),
sexual intercourse with a child under age 13 is rape. Evidence at trial showed that Carter
repeatedly raped the victim while she lived in the City of Danville and that the rapes continued
after she moved to Pittsylvania County during her seventh-grade year. Carter argues on appeal
that one count of rape must be vacated because the Commonwealth failed to establish venue in
Pittsylvania County because the victim could not recall if she was 12 or 13 when the move took
place. To the extent Carter adequately assigned error to this issue, we find the Commonwealth
met the burden to establish a "strong presumption" that Carter sexually assaulted the victim in
Pittsylvania County. We also find that her testimony was not inherently incredible. Thus, we
affirm the trial court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

# BACKGROUND[1]

T.F.[2] was born in January 1989 and lived with her grandmother until she was ten years old. She then moved to Danville to stay with her mother Dawn, her stepfather Carter, her brothers R.B. and J.B., and her younger sister B.C. Carter soon became verbally and physically abusive to her and her brothers. He also began to "groom[]" T.F. by talking about his penis to her. He progressed to "flashing" his penis at her and instructing her to look. "[A]fter a while of doing that," Carter began making her touch his penis. On one occasion, he wiped pre-ejaculate from his penis with his finger and placed it on her lips. T.F. was "confused" and did not know why Carter was doing these things. She "was scared of him [be]cause he was already" physically abusing her and her brothers, and he told her "not to say anything to anybody." Carter also told T.F. that Dawn would not believe her, that T.F. "would tear up the family" if she told, and that Dawn could not provide for T.F. and her brothers by herself. Carter also threatened to kill himself if T.F. "said anything."

The first time that Carter touched T.F.'s vagina, they were alone on the couch. Carter repeatedly tried to slide his hand under her shorts; she eventually stopped resisting, and he touched her vagina. Subsequently, T.F. and Carter were laying on the bed under the covers watching television while her brothers sat on the floor. Carter began rubbing her vagina through her clothes before penetrating her vagina with his finger. T.F. felt "tearing" and "burning," and the "most pain" she "had ever felt." When she went to the bathroom, she saw blood on her underwear. Carter told her that "it was supposed to bleed" because she "los[t] [her] cherry." T.F. could not sit down for

---

[1] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] We use initials to protect the minors' privacy.

- 2 -

several days because of the pain. She did not tell anyone what Carter had done because she was "terrified of him."

Carter then started sexually assaulting T.F. on a regular basis. He performed oral sex on her several times a week in his bedroom after Dawn left for work in the morning. Several weeks after Carter first penetrated her vagina with his finger, he made her undress and lay on a towel in the bathroom while he penetrated her vagina with his penis. T.F. felt "a lot of pain" and was "scared," "frozen," "terrified," and "confused." She "was too scared to say anything," and "just did whatever he told [her] to do."

Thereafter, Carter performed oral sex on T.F., penetrated her vagina with his fingers, and raped her "at least twice a week." He continued doing so for the entire period that the family lived in the City of Danville.

When T.F. was in the seventh grade, the family moved to a residence in Pittsylvania County. She could not distinctly remember the first time Carter raped her in Pittsylvania County because "it was so repetitive." When asked at trial to clarify how old she was when they moved to Pittsylvania County, she responded, "I don't know, like maybe [12] . . . [o]r [13], I don't know. It was seventh grade, I think."

Carter continued to penetrate T.F.'s vagina with his fingers, engage in oral sex with her, and rape her multiple times a week after the move to Pittsylvania County. When Dawn was not home, Carter would rape T.F. in his bedroom. He also raped her when he took her riding on four-wheel all-terrain vehicles in the fields near their residence. On some occasions, Carter raped T.F. in his truck.

Once in Pittsylvania County, Carter showed T.F. how to hunt and would take her hunting with him. When he took her hunting, he would rape her in the woods. T.F. testified that Carter also raped her when he took her hunting in a game preserve in Pittsylvania County. When asked when

she started hunting, she stated that "[she] was maybe [12] or [13], something like that, when [she] got" her hunting license. Carter's actions made her feel "trapped," "scared," "disgusting," and "nasty." She did not try to stop him because she thought he would "physically hold [her] and do it anyways."

As T.F. grew older, she began telling Carter that she did not "want to" engage in sexual activities with him. Carter would not be angry "at the time," but later would get drunk and "be more physically abusive" than usual. When T.F. was in high school, Carter continued to rape and sexually assault her on a weekly basis.

During T.F.'s senior year of high school, she was removed from Dawn and Carter's custody after Carter committed domestic violence against T.F., Dawn, R.B., and J.B. During the investigation of this incident, the police asked T.F. if she had been sexually abused. She did not "say yes or no," but stated that she did not "want to talk about it at that time" and "nobody really questioned [her] any further on it."

T.F. lived with her aunt in Dry Fork until she graduated from high school. When T.F. was 18 years old, she stayed at Dawn and Carter's residence for several weeks. Carter told her that he was sorry for "doing the things that he did to" her.

In 2009, T.F. married Richard Boody. T.F. told Boody that Carter "used to rape" her but did not "go into . . . detail." Later that year, T.F. called Carter while Boody listened. T.F. started talking about how Carter used to mistreat her, her brothers, and her mother, and Carter was "apologetic." When T.F. referenced "the raping and the sexual stuff," Carter "said he was sorry for it." Boody angrily interjected, and Carter stated that T.F. "always got into the truck on her own." Carter then hung up. After the call, T.F. felt relieved because she "finally had somebody else that . . . knew that [she] wasn't lying."

- 4 -

Boody encouraged T.F. to report Carter to law enforcement but she did not "think anybody was going believe her." Still, T.F. called the police and made a report regarding Carter. But she subsequently withdrew the report because she "felt so much guilt and shame" and did not want "people close to" her to "know about it." T.F. and Boody later divorced, and T.F. married Ryan Furguson in 2011. T.F. told Furguson early in their relationship that she had been sexually abused, but did not disclose more specific information about Carter's abuse until time went on.

In 2021, T.F. again reported Carter to the police. In October 2021, the police recorded another call between T.F. and Carter. During the call, Carter admitted that he had done "a lot of mean things" to T.F. and her brothers. T.F. told Carter that she did not "know how to deal with" the "stuff" that Carter did to her specifically. Carter understood what T.F. was saying but stated that he was "not getting into this." T.F. told him that she did not think that he understood the "damage that he did to" her. After T.F. asked if she was the only one who had been sexually abused, Carter ended the call.

A grand jury indicted Carter on a total of 18 offenses. One count each of rape, object sexual penetration, and forcible sodomy were alleged to have been committed on a child less than 13 years of age. The remaining 15 charges were alleged to have been committed against T.F.'s will by force, threat, or intimidation.[3]

At trial, T.F. explained that thinking about her children motivated her to finally report Carter to the police in 2021. Her eldest daughter was 11 years old, and T.F. wanted to have "these conversations with [her] kids about what's appropriate and what's not appropriate." She felt that she could not "have these conversations" with her daughter "knowing that" she could not "acknowledge what happened" to her. She "was just feeling so much guilt and shame" and "any time [she] would look at her daughters," she "would think about it." "[I]f anybody were to ever do

_____

[3] *See* Code §§ 18.2-61(A)(i), (iii), 18.2-67.1(A)(1), (A)(2); 18.2-67.2(A)(1), (A)(2).

- 5 -

. . . anything to them like what was done to" her, she "would want them to know that they could come to [her] and tell [her]."

Three other witnesses testified that T.F. previously disclosed the abuse to them. T.F. had dated V.B. in high school. V.B. said that when he was at T.F.'s residence in high school, he saw Carter "touch [T.F.'s] butt" and heard him make "rude comments." While they were dating, T.F. did not tell V.B. that Carter was sexually abusing her, but T.F. later told him in an online message that Carter had sexually abused her "for a long time," but did not provide details. T.F.'s first husband Boody testified that T.F. had disclosed Carter's abuse to him and that he encouraged her to call law enforcement. Finally, T.F's current husband Furguson testified that "[o]ver the years," T.F. "slowly confided . . . different things that . . . happened" between her and Carter. Furguson never pressed her for details and never pressured her to report to law enforcement. He also testified that whenever T.F. saw a truck with the logo of the company that Carter worked for, she became "nervous," "anxi[ous], and jitter[y]."

At the close of the evidence, Carter moved to strike. He asserted that the Commonwealth failed to establish venue in Pittsylvania County, and also argued that T.F.'s testimony was inherently incredible as a matter of law. The trial court denied the motion. Regarding venue, the trial court stated that T.F. had testified that the family moved to Pittsylvania County when she "was in the seventh grade, twelve years old." T.F. further testified that Carter raped her while they were hunting in Pittsylvania County and that she started hunting when she was 12 or 13 years old. The trial court concluded that T.F.'s testimony "put[] it at . . . less than thirteen."

The jury convicted Carter on all counts, and the trial court sentenced Carter to the jury's recommended 18 life sentences. This appeal followed.

ANALYSIS

Carter challenges the trial court's ruling that the Commonwealth established venue in Pittsylvania County for the one rape count based on T.F.'s age.[4] He also argues that the evidence was insufficient to sustain his convictions because T.F.'s testimony was inherently incredible.

I. Venue

Generally, "the prosecution of a criminal case shall be had in the county or city in which the offense was committed." Code § 19.2-244. "In a criminal trial, the Commonwealth bears the burden of proving venue." *Tanner v. Commonwealth*, 72 Va. App. 86, 94 (2020). "As venue is not a substantive element of a crime, the Commonwealth is not required to 'prove where the crime occurred beyond a reasonable doubt.'" *McGuire v. Commonwealth*, 68 Va. App. 736, 741 (2018) (quoting *Bonner v. Commonwealth*, 62 Va. App. 206, 212 (2013) (en banc)). Rather, the Commonwealth must establish a "strong presumption" that the defendant committed the offense "within the territorial jurisdiction of the [trial] court." *Tanner*, 72 Va. App. at 94 (quoting *Williams v. Commonwealth*, 289 Va. 326, 332 (2015)). When reviewing a challenge to a trial court's venue determination, this Court must determine whether the evidence, viewed in the light most favorable to the Commonwealth, "is sufficient to support the [trial court's] venue findings. *McGuire*, 68 Va. App. at 741 (quoting *Bonner*, 62 Va. App. at 211).

Carter was indicted on one count of rape charged under Code § 18.2-61(A)(iii), alleging that from "December 1, 2001 through January [],[5] 2002, in the County of Pittsylvania, Virginia," he had

---

[4] In his designation under Rule 5A:25(d), Carter did not include an assignment of error challenging the venue determination. No motion to amend the designation was filed. Instead, Carter has included the failure to prove venue under an assignment of error heading in his opening brief. As the Commonwealth has not asked us to consider this a procedural default, we will assume without deciding that Carter has sufficiently assigned error to the venue issue he raises on appeal.

[5] For T.F.'s privacy, we omit the exact date.

sexual intercourse with T.F., a "child less than 13 years of age." While the Commonwealth had to prove beyond a reasonable doubt that Carter had sexual intercourse with T.F. when she was under 13 years of age, it only had to establish a strong presumption that Carter committed this act in Pittsylvania County. *Tanner*, 72 Va. App. at 94. We conclude that the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to support the trial court's finding of proper venue in Pittsylvania County for this count.

T.F. testified that Carter started having sexual intercourse with her at least twice a week when she was 10 or 11 years old, when the family lived in the City of Danville. Carter continued having sexual intercourse with her multiple times a week after they moved to Pittsylvania County when she was in the seventh grade. T.F. testified that she was either 12 or 13 years old then. T.F. turned 13 in January of 2002.

T.F. could not specifically recall the first time that Carter raped her in Pittsylvania County because he raped her so frequently. But she testified that when they moved to Pittsylvania County, Carter showed her how to hunt and that she began hunting with him when she was 12 or 13 years old and got a hunting license. Carter would rape her during those hunting excursions. Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to establish a strong presumption that T.F. moved to Pittsylvania County before her 13th birthday. T.F.'s testimony suggested Carter taught her to hunt as soon as they moved to the country, and hunting season is generally in the fall. T.F. was legally allowed to get a hunting license at age 12, supporting the likelihood that she hunted with Carter that fall leading up to her 13th birthday.

This testimony, viewed in the light most favorable to the Commonwealth, was sufficient to support the trial court's finding that the Commonwealth established a strong presumption that Carter had sexual intercourse in Pittsylvania County with T.F. when she was under 13 years of age. *See*

*McGuire*, 68 Va. App. at 741.  Accordingly, the trial court did not err in refusing to strike this count for lack of venue.

II. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Id.* (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

Carter asserts that T.F.'s testimony is inherently incredible, but "determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify."  *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).  As such, we must accept "the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'"  *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)).  Thus, "we may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'"  *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)).  "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable [people] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of

which reasonable [people] should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

We reject Carter's assertion that T.F.'s testimony was inherently incredible because she offered "no credible explanation" for her delay in reporting the assaults. When Carter began sexually assaulting T.F., he instructed her not to tell anyone and that she would tear the family apart if she did. T.F. also testified that she was afraid to report the abuse because Carter physically and verbally abused her, her brothers, and her mother. Additionally, she explained on the stand that she felt guilty, ashamed, and embarrassed, and worried that no one would believe her. She told the jury that her desire to help her children motivated her to report Carter to the police in 2021. Finally, though T.F. did not unequivocally report Carter to the police until 2021, V.B., Boody, and Furguson all testified that T.F. had told them of the abuse years before 2021.

It was for the jury, not this Court, to consider T.F.'s delay in reporting and her explanation for doing so when determining the credibility of her testimony. *See Maldonado*, 70 Va. App. at 562; *see also Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991) ("The victim's failure to immediately report the incident did not render [her] testimony inherently incredible as a matter of law."). Nothing about T.F.'s testimony that Carter raped her and sexually assaulted her for years was "so contrary to human experience as to render it unworthy of belief." *Lopez*, 73 Va. App. at 84 (quoting *Kelley*, 69 Va. App. at 626). Thus, it was the jury's responsibility to weigh her credibility based on all the evidence in the record. *Juniper*, 271 Va. at 415. As such, we will not disturb the jury's credibility determination.

## CONCLUSION

Accordingly, we affirm the trial court's judgment.

*Affirmed.*