COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, O'Brien and Lorish

GREGORY ANDRE CULPEPPER

MEMORANDUM OPINION*

v.      Record No. 0549-24-3                PER CURIAM
                                            MAY 27, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
John T. Cook, Judge

(Yvonne Z. Schewel; Yvonne Z. Schewel LLC, on brief), for
appellant.

(Jason S. Miyares, Attorney General; Ryan Beehler, Assistant
Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court of Campbell County convicted Gregory Andre

Culpepper of one felony count of strangulation, in violation of Code § 18.2-51.6, and two

misdemeanor counts of assault and battery of a family or household member, in violation of Code

§ 18.2-57.2. On appeal, Culpepper challenges the sufficiency of the evidence to support his

strangulation conviction.[1] After examining the briefs and record in this case, the panel unanimously

holds that oral argument is unnecessary because "the dispositive issue or issues have been

authoritatively decided, and the appellant has not argued that the case law should be overturned,

extended, modified, or reversed." Code § 17.1-403(ii)(b); Rule 5A:27(b).

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Culpepper, however, does not challenge his two convictions for assault and battery of a
family or household member.

## I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).  "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'"  *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

A.P. testified at trial that she and two of her sons, D.C. and C.P., lived in her apartment in Campbell County, Virginia in August 2022.[2]  A.P.'s ex-fiancé, Gregory Andre Culpepper, was staying with her in the apartment at that time.  She stated that she had been in a romantic relationship with Culpepper for "[a]pproximately six years," but that their relationship had ended in January 2022.  A.P. recounted that on the night of August 6, 2022, she "was in bed asleep" when Culpepper "came in the bedroom," "awoke me making a lot of noise," and "called me a lying bitch."  She and Culpepper then "got into a disagreement because he felt like that I was being dishonest with him saying that I wasn't dealing with other guys and I wasn't."  She noted that as their argument progressed, Culpepper "got even more heated."

A.P. recalled that as Culpepper "was getting his clothes together" and "was near the front door," she "just had had enough," so she "started reaching across him to unlock the door" and "to push him out the door."  However, according to A.P., Culpepper then "proceeded to punch me in my face."  A.P. testified, "I tried to defend myself. . . .  I tried to hit him back.  That did not work well."  She noted that Culpepper then "pushed me into my living room," and she stated that "everything after that I was fighting for my life."  She also noted that "[t]here were points when he

---

[2] We use initials in an attempt to better protect the privacy of the victims.

-- he was strangling me. He was beating my head up against the floor. I was screaming out trying to get my son's attention or anybody's attention at that point to try to get him off of me."

C.P., who was 15 years old at the time of the altercation, testified, "I was just in my room minding my business and I heard my mom yell" to "call the police so I came to see if everything was all right." C.P. recalled, "I saw him [Culpepper] on top of my mother choking her so I grabbed an old broom handle and smacked him across the head with it."[3] He noted that Culpepper's hands were "around her throat" and that his mother "was in the living room on the floor." C.P. stated that after he hit Culpepper with the broom handle, Culpepper "threw me over his shoulder and I ended up landing beside my mom." C.P. recounted that Culpepper "kept me down preventing me from getting up so I couldn't go back to my room to call the police." He also recalled that Culpepper "hit me in my back."[4]

When asked to describe the strangulation, A.P. testified that "[i]t was the closest thing to literally seeing death." She recalled that Culpepper "had one hand . . . around my neck while he was punching me in my face. I know I blacked out. I don't know for how long. . . . I just know when I woke up, I was waking up to still trying to get him off of me." She emphasized that she could not breathe and that she could not speak at that point, and she rated the pressure that Culpepper was putting on her neck as "a nine" out of ten. She also noted that she had difficulty swallowing, pain in her throat and neck, and headaches following the strangulation—and that she "sustained a lot of bruising and scratching" and "a lot of body pain."

---

[3] A.P. likewise testified that C.P. "jumped in to try to . . . get him [Culpepper] off of me."

[4] A.P. similarly testified that C.P. "was pinned on the couch" and that she could not intervene between Culpepper and C.P. because "Culpepper, of course, is much bigger than me." A.P. noted that she saw Culpepper "hit [C.P.] a couple times," and she "did see a couple markings and bruising on [C.P.]."

A camera in the hallway of A.P.'s apartment "recorded the altercation in the hallway," and there was "audio on there so you can hear what went on in the living room." Without objection from Culpepper's trial counsel, the Commonwealth introduced into evidence two short video recordings from the camera in the hallway and then played those videos for the trial court. The first video showed Culpepper walking down the hallway toward the front door while carrying a plastic bag and arguing with A.P., who was offscreen in her bedroom. A.P. then walked down the hallway toward Culpepper as they continued to argue. After A.P. pushed past Culpepper, he shoved her into the living room, which was off camera, and then followed her into the room. As A.P. yelled out, Culpepper repeatedly told her to "shut up." A.P. then screamed for C.P. to "call the police." The second video showed C.P. coming out of his bedroom, running down the hall while grabbing a broom handle, and then entering the living room offscreen while A.P. continued to scream. A loud crashing sound can be heard, followed by A.P. again yelling for C.P. to call the police.

During the altercation, A.P. used her smartwatch to call 911. Deputy Reid of the Campbell County Sheriff's Office testified that she, Lieutenant Grider, and Deputy Hagner responded to the 911 call and encountered Culpepper walking along a road near the apartment complex. The police detained Culpepper and then went to A.P.'s apartment, where Deputy Reid spoke to A.P. and "noticed obvious injuries to her face," including "dried blood on the left and right side of her face and what appeared to be dried blood on the left side of her ear." Deputy Reid did not observe any injuries on Culpepper other than "[a] cut on his finger." She then took photographs documenting the injuries that she had observed on A.P. and on Culpepper, and she also took a photograph of the broom handle that C.P. had used during the altercation. Those photographs were admitted into evidence without objection.

Lisa Schmidt, a forensic nurse at Lynchburg General Hospital, testified as an expert in the field of forensic nursing. She testified that she examined A.P. in the emergency room after the altercation, and she observed that A.P.'s "face had injury to it."[5] She noted that A.P. "stated that she had been strangled and assaulted." Schmidt recalled that A.P.

> had an area of redness to her forehead, redness noted to her left nose, an abrasion to the left cheek, abrasion to the left temple region, redness to the left cheek, dried red substance to the left ear, redness noted to the left ear lobe, abrasion to the right cheek, another abrasion behind her left ear and abrasion to the right side of her neck, redness to also to like the front of her neck, a purple bruise noted to the left upper arm, red abrasion noted to the left upper arm, redness noted to her right side, a red bruise noted to the left posterior neck and that's the back of her neck and then red bruising noted to the left scapula, kind of like shoulder area and then . . . like a hyperpigmented area to the left scapula.

Related to A.P.'s complaint of strangulation, Schmidt observed that A.P. "had the redness and abrasions to her neck." Furthermore, A.P. "said that she had difficulty breathing at the time of the incident. She did complain of raspiness to her voice, pain to the side of her throat, her jaw, some blurry vision and she also urinated on herself and complained of a headache." A.P. also said that she incurred these injuries because "a hand had been placed around her neck." However, Schmidt could not determine whether there was any swelling to A.P.'s neck because A.P. did not return for a follow-up visit.

Culpepper testified that during his argument with A.P., he gathered some of his clothes and put them in a plastic bag. He claimed that A.P. then grabbed his dirty clothes from the kitchen floor and went into the bathroom while holding "lighter fluid in her hand."[6] Culpepper stated that when he went into the bathroom, "[y]ou could smell the lighter fluid, you could see the lighter fluid on the

---

[5] Schmidt also took photographs of A.P.'s injuries, which were admitted into evidence without objection.

[6] A.P. maintained that she was holding "[a] thing of lighter fluid" because she "was cleaning up and re-arranging some stuff."

clothes and could . . . also smell it but she didn't set it on fire." According to Culpepper, he then made his way toward the front door to leave the apartment, but the two continued to argue. Culpepper recounted, "When she was trying to take my clothes and after she had hit me, I pushed her like move, don't touch anything of mine." He noted that

> we got into a physical situation and I actually got on the ground and I was trying to restrain her because she was swinging wild, you know, trying to hit me, kept trying to hit me and once I got her hand, her other hand was free, she swung at my face and grabbed my face and I tried to grab her other hand and once I grabbed her other hand, this hand was free so that's when she bit my finger and so once she bit my finger, I kept telling her let my hand go and I tried to press down to try to because she had a lock on my finger and once I pressed down on her face, that's when she let go of my finger.

Culpepper acknowledged that his hand "might have even slipped on her neck," but he maintained that he "didn't strangle her at all." He stated, "I never like grabbed her neck and tried to like put force on her." In addition, Culpepper did not recall C.P. hitting him in the head with the broom handle, but he did "remember him jabbing me with the mop handle in my chest" and "kicking and punching me and then that's when I reached out and grabbed him and held him down."

During closing argument, Culpepper's trial counsel argued that Culpepper and A.P. were engaged "in some kind of mutual verbal thing back and forth" and that A.P. "was destroying his stuff." His trial counsel maintained that "there was a mutual combat thing where they were beating on each other" but that "[t]here's no evidence of the strangulation." His trial counsel emphasized that A.P.'s "explanation of the bottle of lighter fluid is frankly not believable given the condition of the rest of the house." Finally, Culpepper's trial counsel contended that the lack of visible marks in the photographs of A.P. and the differences between A.P.'s trial testimony and her statements to the forensic nurse show that "she was not strangled."

After hearing the evidence and argument, the trial court convicted Culpepper on all counts. The trial court found A.P.'s testimony "to be credible" and "corroborated by the forensic nurse and

the pictures taken by the deputy." The trial court also found A.P.'s "symptoms she described as consistent with a strangulation" and "consistent with what the findings of the forensic nurse in her testimony and the pictures she took." On the issue of strangulation, the trial court "did not find the Defendant credible on that issue." In addition, the trial court found the testimony of C.P. to be "credible that he was assaulted and pushed back and hit back in the back by" Culpepper. The trial noted that the video "was clear" that Culpepper "charged her [A.P.] after this initial altercation." Culpepper now appeals his strangulation conviction to this Court.

## II. ANALYSIS

On appeal, Culpepper argues, "The trial court erred in finding that the evidence was sufficient to convict the defendant of strangulation, in violation [of] § 18.2-51.6 of the Code of Virginia, 1950, as amended." He contends that A.P.'s testimony "was contradictory and not credible" and that it was "inconsistent with . . . the videos."

The Supreme Court has often stated, "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (emphasis in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ

from the conclusions reached by the finder of fact at the trial." *Clark v. Commonwealth*, 279 Va. 636, 641 (2010) (quoting *Commonwealth v. Jenkins*, 255 Va. 516, 520 (1998)).

"Any person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation." Code § 18.2-51.6. The Supreme Court has held that "bodily injury" within the scope of Code § 18.2-51.6 "is any bodily injury whatsoever and includes an act of damage or harm or hurt that relates to the body; is an impairment of a function of a bodily member, organ, or mental faculty; or is an act of impairment of a physical condition." *Ricks v. Commonwealth*, 290 Va. 470, 479 (2015). It is well settled that "[t]o prove a bodily injury, the victim need not experience any observable wounds, cuts, or breaking of the skin. Nor must she offer proof of 'broken bones or bruises.'" *Id.* (quoting *English v. Commonwealth*, 58 Va. App. 711, 719 (2011)). "[I]nternal injuries [also] . . . fall within the scope of Code § 18.2-51.6." *Wandemberg v. Commonwealth*, 70 Va. App. 124, 134 (2019) (alterations in original) (quoting *English*, 58 Va. App. at 719).

It is well established that "determining the credibility of witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, this Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). Indeed, "we may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)). "Evidence is not

'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

In this case, A.P. testified that Culpepper "was strangling me" and that he "had one hand . . . around my neck while he was punching me in my face." She stated that she could not breathe and that she experienced difficulty swallowing, pain in her throat and neck, and headaches following the strangulation. A.P.'s son, C.P., testified that he saw Culpepper "on top of my mother choking her" and that Culpepper's hands were "around her throat." In addition, Deputy Reid (who responded to the 911 call) testified that she "noticed obvious injuries to her [A.P.'s] face." Furthermore, Schmidt (the forensic nurse who examined A.P. after the strangulation) testified that A.P. "stated that she had been strangled and assaulted." According to Schmidt, A.P. stated that "she had difficulty breathing at the time of the incident," and she complained of "raspiness to her voice, pain to the side of her throat, her jaw, some blurry vision and she also urinated on herself and complained of a headache." Schmidt observed that A.P. had "redness and abrasions to her neck," and she noted that A.P. stated that she had incurred these injuries because "a hand had been placed around her neck." Finally, photographs that were admitted into evidence showed bruising and swelling around A.P.'s neck.

The trial court, as the fact finder, heard all the testimony, saw the photographic evidence, and carefully reviewed the video evidence. The trial court specifically found A.P.'s testimony "to be credible" and "corroborated by the forensic nurse and the pictures taken by the deputy." The trial court also found A.P.'s "symptoms she described as consistent with a strangulation" and "consistent with what the findings of the forensic nurse in her testimony and the pictures she took." In addition, the trial court credited the testimony of A.P.'s son, C.P. In contrast, on the issue of strangulation, the trial court "did not find the Defendant credible on that issue." Indeed, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused

and to conclude that the accused is lying to conceal his guilt." *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (alteration in original) (quoting *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018)); *see also Covil v. Commonwealth*, 268 Va. 692, 696 (2004) ("[A] fact-finder, having rejected a defendant's attempted explanation as untrue, may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt."). In short, given that nothing about A.P.'s testimony is "so contrary to human experience as to render it unworthy of belief," *Lopez*, 73 Va. App. at 84, there is no basis for this Court to disturb the trial court's credibility determination and its conclusion that Culpepper was guilty of strangulation.

## III. CONCLUSION

For all of the foregoing reasons, we affirm the trial court's judgment, and we uphold Culpepper's strangulation conviction.

*Affirmed.*