COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Callins and Frucci
Argued at Lexington, Virginia


BRIAN CHRISTOPHER SAMMON

                                                        MEMORANDUM OPINION* BY
v.          Record No. 1189-24-3                        JUDGE STEVEN C. FRUCCI
                                                        JULY 29, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
K. Mike Fleenor, Jr., Judge

Wade M. McNichols for appellant.

Sandra M. Workman, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, Brian Christopher Sammon was convicted of aggravated

malicious wounding, felony abuse and neglect of a vulnerable adult, and assault and battery of a

family member and was sentenced to 30 years of incarceration, with 10 years suspended. On

appeal, Sammon challenges the circuit court's denial of his motion to strike, arguing that the victim

was not a vulnerable person, as defined by Code § 18.2-369, that the victim did not suffer a

significant physical impairment, and that Sammon did not intend to maim, disfigure, disable, or kill

the victim.[1] For the following reasons, we affirm the circuit court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Sammon does not assign error to the assault and battery of a family member conviction.

BACKGROUND[2]

In late 2021, L.W. and her son moved into a trailer together in Elliston, Virginia.[3] At the time, L.W. was 74 years old and had a urinary tract infection that caused her to hallucinate. While the complications of the urinary tract infection subsided, throughout 2022, L.W. began to suffer from episodes of flash edema that she was hospitalized for numerous times. It was also "hard for" L.W. to walk, and she had a history of vertigo and falling and "a fall was possible for her at any point." Sammon would take L.W. to her medical appointments, make her meals, provide her medicines, occasionally help get her in and out of the bathtub, and handled all the shopping and finances of the home. As time went on, Sammon's behavior changed, and he became violent and paranoid. He referred to L.W. as a demon and would tell her that "the demon needed to die." According to L.W., Sammon was "like Jekyll and Hyde," being "fine one minute and not the next." Sammon would put "his hand on [L.W.'s] throat," "cussed [L.W.] out a lot," and hit L.W. "in the vagina and [say] he didn't ask to be born." He would also take money from L.W.'s wallet and prevent her from using her cellphone or car.

One day in December 2022, L.W. tried to stop Sammon from using her car. Sammon threw her "about 12 feet." He then left, leaving L.W. on the floor for several hours and with a bruised backside. On another date, before leaving the room, Sammon called L.W. a demon and used his fist to hit her "on top of [her] head," creating a "knot" on her head. Sammon came back into the room and asked, "are you still alive?" One time, Sammon again called L.W. a demon and said that "the demon had to die." Afterwards, he hit L.W. "up the side of [her] head," made

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). "Accordingly, we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Id.* (quoting *Gerald*, 295 Va. at 473).

[3] We use initials, rather than names, to protect the privacy of the victim.

coffee, threw it on L.W., and said "that's hot isn't it? It burns." The coffee burnt L.W.'s left breast and left a scar. At trial, L.W. said she "still get[s] numbness in [her] face" after these incidents with Sammon.

On December 31, 2022, Sammon was in "a rage." He once again called L.W. a demon and said that "[he] didn't want to hurt [her] but [he had] to kill the demon." After making that statement to her, he hit L.W and "put [her] up against the kitchen counter with his hands around [her] throat." L.W. was "scared that [it] was going to be [her] last day." Sammon let L.W. go and began playing music "as loud as he could" and "started tearing up the house." According to L.W., Sammon "took the thermostat off the wall, he took . . . an air fryer . . . apart," and threw "things up against a wall." L.W. then went to a neighbor's house, who called 911.

L.W. was transported to the emergency room and was attended by Dr. Tawil. Dr. Tawil noted that she was "a relatively thin, frail, elderly . . . woman" who looked "relatively poorly nourished" and had "two burns on her left breast," "a bruise on both sides of her head" and "her medial ankle," and "tenderness . . . in multiple places like her neck [and] her ribs."[4] Dr. Tawil classified the burns as first-degree burns, though, at trial, he said that he did not know if a first-degree burn could leave a scar. He found that, at the time, L.W. "did not demonstrate any signs of being cognitively impaired or having any neurocognitive disorder" and that "[s]he was oriented, she was alert, she was with it." During her physical exam, L.W. "did have some decreased strength," though it was "[n]ot incredibly weak, it wasn't worse on one side or the other."[5] He found no "signs or symptoms that would point towards . . . a stroke or an acute

_____

[4] At trial, L.W. said she required oxygen at this time, but Dr. Tawil testified that she was not requiring oxygen then.

[5] At trial, L.W. at first denied using a walker for assistance at the end of 2022 but then clarified that she could not remember if she used one at that time or not. According to her exam from the emergency room, she had a walker at home but did not use it.

injury to her brain."[6] He also stated that L.W. had indicated that she was able to complete activities of daily living, meaning "things you need to take care of yourself at home."

After Dr. Tawil examined L.W., Michaela Miller, a forensic nurse examiner, completed an examination of her. Miller noted that L.W. had multiple bruises that were in various stages of healing and that she "had a healing wound to her left breast." She opined that the various stages of healing meant that the bruises happened at different times.

Sammon was ultimately charged with aggravated malicious wounding, felony abuse and neglect of a vulnerable adult, and assault and battery of a family member. At trial, a photograph of L.W.'s scar taken days before trial was entered into evidence. At the close of the Commonwealth's case, Sammon moved to strike the evidence. Regarding the aggravated malicious wounding, he argued that the evidence did not show that L.W. suffered a permanent and significant physical impairment nor that Sammon had the necessary intent to commit aggravated malicious wounding. The circuit court found that evidence of "a scar or scarring of any sort . . . satisf[ies the] requirement" of a permanent and significant physical impairment and that there was evidence to support he acted with the intent to disfigure L.W. when he threw the coffee on her. Regarding the neglect of a vulnerable person, Sammon argued the evidence did not show that L.W. was a vulnerable person as defined under Code § 18.2-369. The circuit court found that L.W. was "oriented and didn't suffer any cognitive disability" and that "she was able to take care of herself," "feed herself," "clean herself," "could get dressed," and "do the ordinary things that a person can do." However, the circuit court also found that L.W. "relied on the

---

[6] In between Sammon being arrested and the date of trial, L.W. sought medical attention for her eyes. At trial, L.W. said she has macular degeneration in an eye Sammon had previously injured, but she also stated that the doctor who diagnosed her could not say the macular degeneration was related to the past injury and that she had a prior cataract surgery. Additionally, Dr. Tawil did not see any sign of injuries or abnormalities when examining her eyes in the emergency room.

- 4 -

defendant" and "was very vulnerable in that relationship." Furthermore, it found that she "relies on others to help provide for her" and that "due to her age, her physical stature," she was a "vulnerable person." As such, the circuit court denied the motion to strike. Sammon did not present any evidence and then renewed his motion. After finding that L.W. was a person over 18 who "by reason of her age was unable to safeguard her person," the circuit court denied his motion and convicted Sammon of all three charges. Sammon appeals.

## ANALYSIS

Sammon argues that the circuit court erred by denying his motions to strike the evidence. "A motion to strike challenges whether the evidence is sufficient to submit the case to the [factfinder]." *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013). When faced with a challenge to the sufficiency of the evidence, "we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). When reviewing a circuit court's denial of a motion to strike, this Court will "uphold the judgment of the [circuit] court unless it is plainly wrong or without evidence to support it." *Moore v. Commonwealth*, 59 Va. App. 795, 804 n.4 (2012). To the extent our review requires statutory interpretation, that is an issue of law that "we review de novo." *VACORP v. Young*, 298 Va. 490, 494 (2020) (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)).[7]

I. Permanent and Significant Physical Impairment under Code § 18.2-51.2

"To be convicted of aggravated malicious wounding under Code § 18.2-51.2, the injuries inflicted on the victim must be both a 'significant physical impairment' and 'permanent.'" *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010). Sammon concedes that the scarring

---

[7] Though of course, "[w]e accord '[g]reat deference' to a trial court's factual findings." *Farah v. Commonwealth*, 300 Va. 458, 469 (2022) (quoting *Jones v. Eley*, 256 Va. 198, 201 (1998)).

from the wound at issue is permanent, but he argues on appeal that the "size of the scars, their near invisible nature from the photographs, their locations, and the lack of any ongoing pain or discomfort from them" prevent the injury from rising to a significant physical impairment.

A "physical impairment" is "any physical condition, anatomic loss, or cosmetic disfigurement." *Id.* (quoting *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995)). This Court has routinely found that scarring may constitute a significant and permanent physical impairment. *See, e.g.*, *Newton*, 21 Va. App. at 90. Furthermore, "[i]n such cases [as this], '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). In the case at hand, L.W. was left with numerous bruises, numbness to her face, and a scar that was still visible at the time of trial. Using the necessary standard of review here, it cannot be said that a rational trier of fact could not have found that L.W. suffered significant and permanent physical impairment. As such, the circuit court did not err in denying Sammon's motion to strike on this ground.[8]

---

[8] While Sammon included in his assignment of error the circuit court's finding that L.W. was severely injured, he did not provide any argument or legal authority to support that assertion. "Unsupported assertions of error do not merit appellate consideration." *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 53, 56 (1992)). Therefore, we decline to address whether the circuit court erred in finding that L.W. was severely injured.

II.  Intent to Maim, Disfigure, Disable, or Kill under Code § 18.2-51.2

Sammon contends the circuit court erred by denying his motions to strike when the evidence was insufficient to find that he intended to maim, disfigure, disable, or kill L.W.  To commit aggravated malicious wounding under Code § 18.2-51.2, the defendant must inflict the victim's injuries with the intent to maim, disfigure, disable, or kill.  *See Robertson v. Commonwealth*, 31 Va. App. 814, 823 (2000) (citing *Campbell v. Commonwealth*, 12 Va. App. 476, 483 (1991) (en banc)).  "Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances, including the 'words or conduct' of the alleged offender." *Fary v. Commonwealth*, 77 Va. App. 331, 342 (2023) (en banc) (quoting *Secret*, 296 Va. at 228-29), *aff'd*, 303 Va. 1 (2024).  "The fact finder is often allowed broad latitude in determining specific intent of the actor."  *Fortune v. Commonwealth*, 14 Va. App. 225, 229 (1992).  Indeed, "[i]ntent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact."  *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)).  "In determining a defendant's intent, '[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'"  *Id.* (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).  "A person's conduct may be measured by its natural and probable consequences.  The finder of fact may infer that a person intends the natural and probable consequences of his acts."  *Campbell*, 12 Va. App. at 484 (superseded by statute on other grounds).

Here, following a series of acts of violence by Sammon toward L.W. and him calling her that very day a demon that "had to die," Sammon came up to her and threw coffee on her that was hot enough to burn her and leave a scar.  After throwing the coffee on her, Sammon said to

L.W.: "That's hot isn't it?  It burns."  Based on his conduct, a reasonable factfinder could find that he inflicted L.W.'s injuries with the intent to maim, disfigure, disable, or kill.  As such, the circuit court did not err in denying Sammon's motion to strike on this ground.

III.  Vulnerable Adult under Code § 18.2-369

Sammon argues that the circuit court erred by finding that L.W. was a vulnerable adult under Code § 18.2-369 because she had the ability to communicate clearly and "her age did not substantially limit her ability to care for herself."  Under Code § 18.2-369(A), "[i]t is unlawful for any responsible person to abuse or neglect any vulnerable adult."  If such a person abuses or neglects a vulnerable adult and it "results in serious bodily injury or disease to the vulnerable adult," they have committed a "Class 4 felony."  Code § 18.2-369(B).  A vulnerable person under the statute is:

> [A]ny person 18 years of age or older who is impaired by reason of mental illness, intellectual or developmental disability, physical illness or disability, or other causes, including age, to the extent the adult lacks sufficient understanding or capacity to make, communicate, or carry out reasonable decisions concerning his well-being or has one or more limitations that substantially impair the adult's ability to independently provide for his daily needs or safeguard his person, property, or legal interests.

Code § 18.2-369(C).  While this definition allows for multiple causes of impairment, it dictates that the adult must be impaired to a certain extent to be considered a "vulnerable person."  As such, it is only when age, or another cause of impairment, prevents one from understanding or making reasonable decisions or substantially impairs one from independently providing for her daily needs or safeguarding oneself, property, or legal interests that a person is a "vulnerable person" under the statute.

In the case at hand, a rational trier of fact could find that L.W.'s age and health ailments substantially impaired her ability to independently provide for her daily needs or safeguard herself and property.  It is undisputed that L.W. was in her seventies at the time of offense.

Dr. Tawil testified that L.W. was "a relatively, thin, frail, elderly . . . woman" who showed a decrease in strength in her physical exam. Furthermore, at the time of the offense, L.W. suffered from vertigo and edema. "[A] fall was possible for her at any point." With her age and frailty, she needed help bathing, shopping, and going to medical appointments.[9] Furthermore, the effect of her frailty and age on her ability to safeguard her person and property was evident by L.W.'s inability to pick herself up off the ground for several hours after Sammon threw her down and her unsuccessful attempts at keeping Sammon away from her vehicle and from destroying her personal property. As the record supports that L.W. was substantially impaired from independently providing for or safeguarding herself, her property, or her legal interests due to her age and all of her ailments, the circuit court did not err in denying the motion to strike that claimed that L.W. was not a "vulnerable adult" under Code § 18.2-369.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*

---

[9] Notably, though the circuit court stated that L.W. was "oriented and didn't suffer any cognitive disability," "that she was able to take care of herself," and that she "could clean herself, she could get dressed, she could do the ordinary things that a person can do," it clarified these statements by also finding that L.W. "relies on others to help provide for her" and that "by reason of her age was unable to safeguard her person."

Callins, J., concurring.

Although I agree with, and join, my colleague's decision today, I write separately to emphasize that advanced age, alone, is not sufficient to render an adult a "vulnerable person" under Code § 18.2-369. Rather, the statute provides that an adult is a "vulnerable person" when they suffer an impairment by reason of their age "to the extent the adult lacks sufficient understanding or capacity to make, communicate, or carry out reasonable decisions concerning [their] well-being or has one or more limitations that substantially impair the adult's ability to independently provide for [their] daily needs or safeguard [their] person, property or legal interests." Code § 18.2-369(C). Here, the record demonstrated that L.W. suffered from vertigo, edema, declining strength, and faced the possibility of a fall at any moment. These physical *impairments* shared a causal nexus with her advanced age and rendered her substantially unable to safeguard her own person. More to the point, an adult like L.W. is a "vulnerable adult" because of the limitations created by impairments incidental to her age, not merely *because of* her age.